# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA
Docket No. 21-CR-108 (PAM)

------------------------------------------------------

UNITED STATES OF AMERICA,

                        Plaintiff,

vs.

DEREK MICHAEL CHAUVIN,

                        Defendant.

**DEFENDANT'S POSITION
REGARDING SENTENCING**

------------------------------------------------------

The Defendant, Derek Michael Chauvin, through his attorney Eric J. Nelson, Halberg Criminal Defense, respectfully requests that this Court recognize the policies embodied in the Federal Sentencing Guidelines, as well as those enumerated at 18 U.S.C. § 3553(a), to sentence Mr. Chauvin to 240 months in prison, with credit for the time he has already served in relation to this matter, followed by a supervised release period of not more than five years. Accordingly, the Defense submits the following.

## I. PROCEDURAL FACTS AND PRESENCE INVESTIGATION

### A. State charges and trial.

On May 29, 2020, the State of Minnesota charged Defendant Derek Michael Chauvin with one count of third-degree murder, in violation of Minn. Stat. § 609.195(a), and one count of second-degree manslaughter, in violation of Minn. Stat. § 609.205, subd. 1, for his alleged role in the death of George Floyd. Mr. Chauvin surrendered to police, was taken into custody, and incarcerated at Minnesota Correctional Facility ("MCF")-Oak Park Heights, a maximum-security prison. On June 3, 2020, the state amended its

complaint to add one count of second-degree felony murder, in violation of Minn. Stat. § 609.19, subd. 2(1), against Mr. Chauvin. On June 30, 2020, the district court set a trial date of March 8, 2021, for Mr. Chauvin and his codefendants. On October 7, 2020, Mr. Chauvin was released on bond.

On January 11, 2021, the district court issued an order severing Mr. Chauvin's case from those of his codefendants. Mr. Chauvin proceeded to trial in Hennepin County, as scheduled, on March 8, 2021, despite several Defense motions to continue the case or change venue due to intense publicity surrounding the trial. The state trials of his codefendants have been continued multiple times. Two of Mr. Chauvin's codefendants have yet to stand trial on the state charges they face as a result of Mr. Floyd's death.[1]

On April 20, 2021, a jury convicted Mr. Chauvin of one count of second-degree, unintentional murder, one count of third-degree depraved mind murder, and one count of second-degree manslaughter. Mr. Chauvin was again remanded to custody. On May 4, 2021, Mr. Chauvin moved the court for a new trial on several grounds. The court denied Mr. Chauvin's motion, and, on June 25, 2021, sentenced Mr. Chauvin to 270 months of imprisonment, which he is currently serving at MCF-Oak Park Heights.

**B. Federal charges and guilty plea.**

On May 6, 2021, a federal grand jury indicted Defendant Derek Michael Chauvin on two counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242, related to the death of George Floyd. Mr. Chauvin made his initial appearance in federal

---

[1] All three codefendants were convicted on federal charges in February 2022. Codefendant Thomas Lane has since pleaded guilty to a state charge.

court, pursuant to a writ of *habeas corpus,* on June 1, 2021. On June 24, 2021, primary jurisdiction over Mr. Chauvin was transferred to federal custody, pursuant to a memorandum of agreement between state and federal authorities.

On December 15, 2021, the Government filed an information charging Mr. Chauvin with an additional count of deprivation of rights under color of law, in violation of 18 U.S.C. § 242, related to an incident that occurred during a police investigation on September 4, 2017. On the same day, pursuant to a plea agreement (Docket No. 142) between Mr. Chauvin and the government, the Defendant appeared before this Court and pleaded guilty to count I of the indictment and count I of the information. Pursuant to the agreement, all other charges against Mr. Chauvin would be dismissed.

The Rule 11(c)(1)(C) agreement contained several stipulations but permitted Mr. Chauvin to withdraw his guilty pleas if the Court declined to accept the terms of the agreement. On May 4, 2022, this Court filed an order accepting the terms of the plea agreement and agreed to sentence Mr. Chauvin in accordance with its terms. (D.N. 333). In the interim, on January 7, 2022, U.S. Probation conducted a presentence interview with Mr. Chauvin, in the presence of counsel, at MCF-Oak Park Heights. Probation filed its final presentence investigation report ("PSR") on May 25, 2022. (D.N. 350).

Ultimately, the parties and the Court have agreed that Mr. Chauvin will be sentenced on the two counts of conviction to a term of imprisonment of at least 240, but not greater than 300 months, along with a five-year term of supervised release. (D.N. 142 at 14; D.N. 333); *see* F. R. Crim. P. 11(c)(1)(C). Mr. Chauvin will serve any sentence imposed by the Court concurrently with the 270-month sentence imposed in Mr. Chauvin's state court

case. (D.N. 142 at 14). At sentencing, the Court should adjust its sentence to account for time served by Mr. Chauvin in jail or prison related to this matter or the state court case that addressed the same offense. (*Id.* at 14-15).

The Defense submits that, pursuant to 18 U.S.C. § 3553, in light of Mr. Chauvin's acceptance of his wrongdoing, the fact that he has already been punished by one jurisdiction for the offenses alleged here, and his remorse for the harm that has flowed from his actions, this Court should sentence Mr. Chauvin to 240 months' imprisonment, less time served, and a supervised release period of no more than five years. Such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing, especially when Mr. Chauvin's conduct is compared with that of other, similarly-situated criminal defendants. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)(2)).

## II. APPLICABLE SENTENCING PRINCIPLES AND CONSIDERATIONS

The longstanding principle that "the punishment should fit the offender and not merely the crime" is codified at 18 U.S.C. § 3661. Under that provision, "No limitation shall be placed on the information" that a sentencing court may take into account when "considering the [defendant's] background, character and conduct." *See Williams v. New York*, 337 U.S. 241, 247 (1949). This principle is also expressly incorporated in the United States Sentencing Guidelines at § 1B1.4. "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law").

Although a sentencing court must "give respectful consideration to the Guidelines… [it is permitted to] tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (referencing post-*Booker*[2] opinions which reiterate that the Federal Sentencing Guidelines are advisory only). "[T]he district court is free to make its own reasonable application of the [section] 3553(a) factors and to reject (after due consideration) the advice of the Guidelines." *Id.* at 113 (Scalia, J., concurring).

Thus, every federal sentencing case involves application of 18 U.S.C. § 3553(a), and this Court has no doubt seen and recited the relevant portions of that statute hundreds of times. However, the fundamental mandate of the statute remains worthy of emphasis: The sentence imposed on a person must be "sufficient, but no greater than necessary" to comply with the purposes of sentencing set forth in the statute. 18 U.S.C. § 3553(a).

To determine what sentence is sufficient, but not greater than necessary, the Court considers the seven section 3553(a) factors:

(1) the offense and the person being sentenced;
(2) the need for the sentence to provide just punishment, adequate deterrence, protection of the public, and appropriate treatment for the defendant;
(3) the kinds of sentences available;
(4) the Guidelines range for the defendant;
(5) pertinent policy statements of the Guidelines;
(6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar misconduct; and
(7) the need to provide restitution to any victims.

The applicable Guidelines range (the fourth factor) generally provides a starting point from

---

[2] *United States v. Booker*, 543 U.S. 220 (2005).

which to begin the sentencing process because it encompasses many facets of the individual defendant (such as criminal history), the circumstances of the crime, and any relevant specific offense conduct.

### A.  Sentencing range for the Defendant (18 U.S.C. § 3553(a)(4)).

In a typical case, the Guidelines range is determined by a defendant's criminal history and the calculated offense level, which captures many details of the crime itself. However, given the unusual circumstances of this case—*e.g.,* Mr. Chauvin is already serving a lengthy state prison sentence for the more serious offense of conviction in this matter—and the terms of the Rule 11(c)(1)(C) plea agreement, the parties and the Court have agreed to be bound by a sentencing range outside of the sentencing guidelines. Here, the relevant sentencing range is 240 to 300 months.

This range is reflective of the Court's post-*Booker* discretion in sentencing and underscores that it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Kimbrough*, 552 U.S. at 110; see also *Spears v. United States*, 555 U.S. 261, 845 (2009) (per curiam) (clarifying that "district courts are entitled to reject and vary categorically from the Guidelines based on a policy disagreement with those Guidelines"); *United States v. O'Connor*, 567 F.3d 395, 398, n.4 (8th Cir. 2009) (holding that the sentencing discretion announced in *Kimbrough* applies broadly). Under *Kimbrough*, then, a sentence for Mr.

Chauvin that would have fallen within the guidelines range, which is, itself, a product of arbitrary and exaggerated statutory directives, could not possibly be an appropriate sentence. *Kimbrough*, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)(2)) (holding this Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing goals enumerated in 18 U.S.C. § 3553(a)(2). Thus, it is clear that the 240 to 300 month range arrived at by the parties and the Court best reflects the most appropriate range for sentencing Mr. Chauvin in this matter—leaving the Court to determine where, within such range, its sentence should fall.

B. **The history and characteristics of the Defendant and the nature and circumstances of the offense.**

In sentencing Mr. Chauvin, this Court is required by law to impose a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing goals enumerated in 18 U.S.C. § 3553(a)(2). *Kimbrough*, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)(2)). Those goals are: "[First,] to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [second,] to afford adequate deterrence to criminal conduct; [third,] to protect the public from further crimes of the defendant; and [fourth,] to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2); *see also Kimbrough*, 552 U.S. at 101.

> The statute further provides that, in determining the appropriate sentence, the court should consider . . . "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need

> to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*Kimbrough*, 552 U.S. at 101 (internal citations omitted).

The Defense urges the Court, in crafting a "sufficient" sentence, not to view Mr. Chauvin solely in relation to the crime he committed and for which he has been convicted. To do so would oversimplify Mr. Chauvin's life and unfairly disregard the positive qualities he possesses and the sincere desire he holds to continue his rehabilitation.

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Accordingly, Mr. Chauvin's personal characteristics, as well as the circumstances surrounding his conviction, are addressed below.

     *i.*   *Mr. Chauvin's personal characteristics*

The PSR contains a detailed and accurate description of Mr. Chauvin's personal background, so the Defense will not offer a lengthy recitation of the majority of the facts contained therein. However, some relevant highlights are important. Mr. Chauvin was born in 1976 to a loving mother, father, and sister. He grew up near the Twin Cities and completed high school in a local suburb. Although Mr. Chauvin, when he was younger, struggled to find passion for a particular career, he eventually decided to become a police officer. After several years of working in the profession, Mr. Chauvin obtained his Bachelor of Science in Law Enforcement in 2006, while on the job as a Minneapolis police

officer. Prior to the events of May 25, 2020, Mr. Chauvin had a stable job, having worked full-time for the Minneapolis Police Department for nineteen (19) years.

Mr. Chauvin is forty-six (46) years old as he stands before the Court. At the time of the offense conduct, he was forty-four (44) years old, living with his wife and acting as a father figure to his stepsons. He is now divorced and imprisoned at MCF-Oak Park Heights, where he spends much of his time in solitary confinement, largely for his own protection because of his former profession as a police officer and the highly-charged circumstances surrounding his offense and conviction. Independent of the long-term damage a prison sentence will certainly inflict upon Mr. Chauvin's life prospects, given his age, convictions for officer-involved offenses significantly increase the likelihood of him becoming a target in prison.[3] Such safety concerns are evident by his presentence solitary confinement in a high-security prison. In fact, regardless of his ultimate designation, he may never be placed in a general population situation due to his status as a former police officer and the intense publicity surrounding his case.[4]

Even outside of prison, the life expectancy of police officers is already shorter than that of the average citizen, and police officers have a significantly higher average probability of death from specific diseases than do males in the general population.[5] Mr.

---

[3] *See, e.g.,* Frank Main, "What awaits Jason Van Dyke in prison, according to experts, ex-cop who did time." *Chicago Sun-Times,* Oct. 19, 2018. Available from https://chicago.suntimes.com/2018/10/19/18413318/what-awaits-jason-van-dyke-in-prison-according-to-experts-ex-cop-who-did-time, last accessed Jun. 6, 2022.

[4] "To put a convicted police officer in the general population is to sign their death warrant." *Id.*

[5] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4734369/ (accessed Jun. 6, 2022).

Chauvin has been preliminarily diagnosed with heart damage and is, therefore, like many ex-law enforcement officers, at greater risk of dying at a younger age.

Mr. Chauvin is not the average offender. Prior to the offenses in question, Mr. Chauvin led a hard-working, law-abiding life, and had experienced no legal issues until the point of his arrest. He has no prior criminal history apart from traffic violations. Mr. Chauvin has committed a serious crime, was previously convicted in state court, and has admitted his wrongdoing here. He quickly pleaded guilty to his offenses, and his remorse will be made apparent to this Court. Mr. Chauvin is ready to face the Court's judgment and continue to atone for his wrongdoing.

Throughout these proceedings, as well as those in state court, and in the face of unparalleled public scorn and scrutiny, Mr. Chauvin has been very respectful to the judicial process, the Court, and the Government. In fact, Mr. Chauvin turned himself into police upon learning that a complaint and warrant had been issued in his case. After making bail and being released on conditions in the state court matter, Mr. Chauvin remained out-of-custody, attended all court appearances, was never unruly, was properly dressed for court, and was deferential to the Court under all circumstances. Critically—and tellingly—Mr. Chauvin did not violate any of the conditions of his release from custody up until the day the state jury's verdict was announced and he was remanded to prison.

In the eyes of the public, Mr. Chauvin has been reduced to his role in the death of Mr. Floyd, and he has been painted as a dangerous man—despite having served his community as a police officer for almost two decades, receiving consistently high scores on annual reviews, and being well-regarded by his supervisors and peers. Mr. Chauvin has

10

received various honors and commendations for his work in the Minneapolis Police Department, including two medals of valor, two medals of commendation, and various lifesaving awards.

However, behind the politics, Mr. Chauvin is still a human being. Before this incident occurred, Mr. Chauvin was an average man with a loving family and close friends. He was a husband, stepfather, uncle, brother, and son. To this day, Mr. Chauvin has a close relationship with his family and friends, and he benefits tremendously from their support. He has the support of many friends and relatives, several of whom have written letters to the Court on his behalf.

This Court has received letters of support, filed under seal, that uniformly plea for leniency in sentencing. The letters demonstrate the support that has been extended to Mr. Chauvin by family and friends—the people who know him most intimately. They describe Mr. Chauvin as a thoughtful, selfless, introspective, and hardworking gentleman. C.W. and B.W., Mr. Chauvin's relatives, describe Mr. Chauvin's selfless and nurturing personality from a young age, writing,

> He was very dedicated to serving, as is evident when he enlisted in the Army as a young man. I always was impressed with how he nurtured his grandmother as a young adult when he lived and cared for her.

(B.W., at 1.).

Another of Mr. Chauvin's relatives echoed the same sentiment, writing,

> I have always known Derek to be a very caring, hardworking and a wonderful soul. Derek Lived [sic] and took care of his Grandmother. I would not trust my mom to anyone but Derek.

11

(C.W. Ltr., at 1).

While much has been made of Mr. Chauvin's character throughout this case, his family and friends are unwavering on his sound morals, V.W. has known Mr. Chauvin for well over a decade and writes,

> Although the media portrays him to be unusually quiet, he is just a loving man who loves talking about cars, movies and his love of dogs and animal rescue. Derek was a gentleman and always went above and beyond to help others before himself.

(V.W., at 1).

One of Mr. Chauvin's relatives refers to Mr. Chauvin's sense of morality and selflessness, writing,

> He is a hardworking man who also devoted his life to his career. Derek would even volunteer to work holidays to make sure other families were safe during those times. He was a person willing to do more than what was required from him, even things that did not fall into his line of duty.

(D.L. Ltr., at 1).

Mr. Chauvin's presence was felt not only by family and friends, but also in his community, which he enjoyed serving. J.H., a close family friend, describes the emotion surrounding Mr. Chauvin's absence, writing,

> Wherever he would be, those around him reaped the benefits of his presence. He has brought joy, comfort, love and so many blessings to others. Derek is a son, a brother, a nephew – was a devoted husband and stepfather – and a dear friend to many. His absence is felt deeply.

(J.H. Ltr., at 1).

Not only do Mr. Chauvin's family and friends extend their present support, but they also voice their continued support for Mr. Chauvin in the future. The letters received by

this Court emphasize—consistently—their support for Mr. Chauvin. Family friend L.P.

writes,

> I feel strongly in my heart that a lengthy sentence would not serve him
> well. As I had mentioned earlier in this letter, Derek will always have
> my support as well as the support from many others, no matter what.

(L.P. Ltr., at 1).

In his own letter, M.G. reiterates his belief in Mr. Chauvin's character and the

counterproductivity of a lengthy incarceration in his own plea for lenient sentencing,

> I think an extended incarceration time for Derek Chauvin would not
> serve the public interest due to the man that I have explained to you
> in this letter. He is a good man and deserves to have a chance to
> rebuild his life one day, after respectfully serving the time that is
> imposed upon him.

(M.G. Ltr., at 2).

Support is a two-way street, and those who express their support for Mr. Chauvin

also emphasize their need for Mr. Chauvin's support. In his plea for this Court's leniency

in sentencing, Mr. Chauvin's relative G.X. details who Derek Chauvin is—in stark contrast

to what is seen in the media. (G.X. Ltr.). G.X. explains how Mr. Chauvin supported him,

his brother, and mother when they were struggling financially. (*Id.* at 1.). He explains how

Mr. Chauvin taught him life lessons, such as how to drive. (*Id.*). G.X. further details how

Mr. Chauvin did not hesitate to take in G.X.'s biological father upon hearing that he was

terminally ill. (*Id.*). G.X. states that "[l]osing my father was hard enough, and what feels

like losing another is unbearable." (*Id.* at 2.). At the end of his plea, he writes,

> A lengthy sentence will not change that day or the outcome of what
> happened, as my prayers continue for those affected by this.

(*Id.*).

K.C., another relative, also wrote a letter on Mr. Chauvin's behalf. (K.C. Ltr.). K.C. details her journey with Mr. Chauvin, describing his dedication to his family and the Minneapolis Police Department. (*Id.* at 2.). She also describes Mr. Chauvin taking in, and providing for, her three nephews in their time of need and his selflessness when caring for Ms. Chauvin's elderly mother. (*Id.* at 1). K.C. also asks the Court for leniency in sentencing, writing,

> I know a lengthy incarceration will not change the outcome of what happened on May 25th[,] 2020. I pray that you will know the Derek myself and his family and friends knows and consider mercy for Derek with sentencing and allow him to come home to be with his family and rebuild his life.

(*Id.* at 2.).

Further, since his arrest in 2020, Mr. Chauvin has received thousands of local, national, and international letters of support from the public. The level of support Mr. Chauvin continues to receive speaks to his character and qualities as a human being, which this Court must consider when determining the appropriate sentence.

     ii.   *Mr. Chauvin's offenses*

On December 15, 2021, Mr. Chauvin pleaded guilty to one count of deprivation of individual rights under color of law, in violation of 18 U.S.C. § 242 with respect to his actions related to the death of Mr. Floyd. He also pleaded guilty to a second violation of 18 U.S.C. § 242 with respect to the injury of a juvenile detainee that occurred in September 2017. Both offenses occurred while Mr. Chauvin was acting in his official capacity as a

Minneapolis Police Department[6] officer and are described in greater detail in the presentence investigation report. (*See* PSR at ¶¶ 9 through 51).

C. **The need for the sentence imposed.**

Under 18 U.S.C. § 3553(a)(2), "the need for the sentence imposed" is divided into four subdivisions for the Court to consider: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Each factor is addressed below.

i. *The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

Just punishment does not mean the longest sentence possible; it means a sentence that is fitting for the crime Mr. Chauvin committed in light of who Mr. Chauvin is as a person. Just as importantly, it means a sentence that will come closest to accomplishing the many intersecting goals that are foundational to our criminal justice system. The need for

---

[6] Since the events underlying this matter took place, at least one government investigation has excoriated the Minneapolis Police Department for its policing practices and policies, including its systemically disproportionate treatment of Black individuals and the frequency of its officers' use of force. *See* Minnesota Dept. of Human Rights, *Investigation into the City of Minneapolis and the Minneapolis Police Department,* Apr. 27, 2022, available from https://mn.gov/mdhr/assets/Investigation%20into%20the%20City%20of%20Minneapolis%20and%20the%20Minneapolis%20Police%20Department_tcm1061-526417.pdf, last accessed Jun. 6, 2022. The results of a DOJ investigation into MPD's policing practices, announced by Attorney General Garland on April 21, 2021, have not yet been released.

retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, "Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: 'Proportionality' Relative to What?," 89 *Minn. L. Rev.* 571, 590 (Feb. 2005).

No one argues that Mr. Chauvin's crime was insignificant or deserving of a sentence that could easily be mistaken as "meaningless." However, the 270 months he is already serving in a maximum-security facility is an enormous amount of time for a middle-aged man with no criminal history and who will not be permitted back into society until he is well into his sixties. Mr. Chauvin's career prospects, for all intents and purposes, are gone, and once released, he will likely continue to be publicly vilified like few other people in this country's legal history.

In *United States v. Anderson*, the Eighth Circuit Court of Appeals affirmed a district court's downward variance because it was just to do so given the "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company . . . and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system." 533 F.3d 623 (8th Cir. 2008). Mr. Chauvin has suffered collateral punishment—on a much grander scale—similar to that the *Anderson* court contemplated. "Just" punishment is a holistic concept and in order to accurately categorize a punishment as "just," this Court cannot overlook the collateral

16

impact of Mr. Chauvin's convictions and sentences on Mr. Chauvin, as well as his family.

In addition to "the need to provide just punishment for the offense," another aim under of sentencing under 18 U.S.C. § 3553(a)(2) is to promote respect for the law. Mr. Chauvin, arguably, spent his entire career attempting to promote respect for the law, only to find himself on the wrong side of it. One can only imagine what a police officer serving a 270-month prison sentence will experience. Once released, there can be no doubt that Mr. Chauvin will do all that he can to avoid putting himself in a similar situation. A federal sentence of more than 20 years would do nothing more to promote respect for the law—rather, it would merely be cumulative retribution.

Clearly, a lengthy, 240-month federal sentence on top of the existing 270-month state sentence is more than enough to promote respect for the law in Mr. Chauvin and among those who might have contemplated acting similarly. "Respect" for the law does not mean "fear" of the law and, at best, a prison sentence longer than the time Mr. Chauvin is already serving, under these facts, would sow *disrespect* for the law: It would appear disproportional and arbitrary—and, potentially, politically motivated.

This case involves a middle-aged, first-time offender with *no prior criminal record*, who committed his crimes *unintentionally*—as a jury found and as he has pleaded. A sentence of 240 months' imprisonment plus five years of supervised release would reflect the seriousness of the offense, promote respect for the law, and serve as a just punishment for Mr. Chauvin's actions.

### ii.   The need to afford adequate deterrence to criminal conduct

The need to afford adequate deterrence to criminal conduct contemplates not only

deterring the Defendant from committing future crimes but deterring others from committing similar offenses. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, "Purposes and Functions of Sentencing," *34 Crime & Just.* 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.

Findings from the Institute of Criminology at Cambridge University bolster such conclusions regarding the notion of general deterrence. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).[7] The report, commissioned by the British Home Office, examined criminal penalties in the United States, as well as in several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and the severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "***correlations between sentence severity and crime rates… were not sufficient to achieve statistical significance.***" *Id.* at 2 (emphasis added). The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. In fact, according to "the best available evidence…, prisons do not reduce recidivism more than noncustodial sanctions." Francis

---

[7]   Summary    available    from    U.S.    DOJ,    Office    of    Justice    Programs, https://www.ojp.gov/library/abstracts/criminal-deterrence-and-sentence-severity-analysis-recent-research, accessed Jun. 6, 2022.

T. Cullen *et al.,* "Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science," 91 *Prison J.* 48S, 50S-51S (2011). Hence, a 240-month, concurrent sentence—for, essentially, the same behavioral incident—is more than sufficient to serve the purpose of deterring future crime.

### iii.  *The need to protect the public from further crimes of the defendant*

In light of Mr. Chauvin's minimal criminal history, his chances for recidivism are quite low. The almost 20-years in prison that he will serve, combined with his reputational loss and financial ruin, will certainly deter him from engaging in any similar behavior in the future. In fact, given the circumstances of his crime—acting in the line of duty as a police officer—his conviction, alone, will *prevent* Mr. Chauvin from ever being a position to commit such a crime again. Mr. Chauvin has owned up to his offense, admitted his wrongdoing and will spend the next two decades paying his debt to society. Moreover, upon release, he will be subject to stringent supervisory conditions and potentially-unbearable public scrutiny, which further deter any sort of similar conduct. A 20-year concurrent sentence is more than sufficient to protect the public from any further crimes from Mr. Chauvin.

### iv.  *The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner*

Mr. Chauvin has a high school diploma, an associate degree, and a bachelor's degree. However, his offenses will most likely prevent him from ever working in law enforcement again, and upon release, he will be at an advanced age, further complicating his employment prospects. Thus, an opportunity for additional education or vocational

training may be welcome—however, his unique circumstances clearly limit his ability to be present in classroom situations. Moreover, given his physical and mental health conditions, Mr. Chauvin will likely need ongoing medical care. As he ages into his sixties, the most effective way to address Mr. Chauvin's vocational and medical needs will be outside the prison setting.

### D. **A sentence of 240 months' imprisonment is commensurate with sentences imposed upon other, similarly-situated defendants.**

The Congressional mandate to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct should guide this Court in fashioning an appropriate sentence for Mr. Chauvin. 18 U.S.C. § 3553(a)(6); *see Kimbrough*, 552 U.S. at 101. The push toward sentencing uniformity "does not consist simply of similar sentences for those convicted of violations of the same statute [but] consists, more importantly, of *similar relationships between sentences and real conduct*." *Booker*, 543 U.S. at 253-54 (emphasis added).

The Eighth Circuit has limited its interpretation of § 3553(a)(6) to disparities among defendants who have committed similar offenses and who have been sentenced by the *same court. See United States v. Harvey,* 890 F.3d 1130, 1133 (8th Cir. 2018) ("We have declined to require that a district judge 'must compare and contrast the defendant under consideration with a similar offender who has been sentenced by another federal judge.'") (quoting *United States v. Barron,* 558 F.3d 866, 860 (8th Cir. 2009)); *see also United States v. Soliz,* 857 F.3d 781, 783 (8th Cir. 2017) ("The sentencing practices of one district court are not a reference point for other courts"). Although this Court presided over the jury trials

of Mr. Chauvin's codefendants, none of have been sentenced. Clearly, Mr. Chauvin's particular combination of legal circumstances is somewhat unusual. As such, national sentencing statistics may assist the Court in crafting its sentence in this matter.

In fact, most circuits interpret section 3553(a)(6) as requiring a national comparison of defendants and sentences. The Eighth Circuit's interpretation of section 3553(a)(6) is an outlier that stands in stark contrast to the manner in which the statute is construed by a majority of other circuits. For example, the Sixth Circuit has held that:

> '[s]ubsection 3553(a)(6) is concerned with *national* disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct…' This factor is designed to 'ensure nationally uniform sentences among like offenders.'

*United States v. Houston,* 529 F.3d 743, 752 (6th Cir. 2008) (quoting *United States v. Simmons,* 501 F.3d 620, 625 (6th Cir. 2007)) (emphasis in original).

The Eleventh Circuit has also acknowledged that "§ 3553(a)(6) is focused primarily on nationwide sentencing disparities." *United States v. Ronga,* 682 Fed.Appx. 849, 859 (11th Cir. 2017). The First, Second, Third, Fifth, Seventh and Ninth Circuits have also concluded that national uniformity is the appropriate analysis under which to construe 18 U.S.C. § 3553(a)(6). *See, e.g. United States v. Saez*, 444 F.3d 15, 18 (1st Cir. 2004) (Congress's "aim was almost certainly a *national* uniformity focusing upon a common standard and looking to how *most* cases of the same kind were treated.") (emphasis in original); *United States v. Fernandez,* 443 F.3d 19, 31–32 (2d Cir.2006); *United States v. Douglas,* 885 F.3d 145, n. 6 (3rd Cir. 2018); *United States v. Candia,* 454 F.3d 468, 476 (5th Cir. 2006); *United States v. Pisman,* 443 F.3d 912, 916 (7th Cir. 2006); *United States*

*v. Paopao,* 736 Fed. Appx. 641 (9th Cir. 2018).

Here, the primary guideline on which Mr. Chauvin's sentence must be based is U.S.S.G. § 2H1.1. (PSR at ¶¶ 58, 64). In Fiscal Year ("FY") 2021, only 30 cases, nationwide, were sentenced under this section as a primary guideline.[8] An additional 49 cases made reference to the guideline.[9] The length of the average sentence for deprivation of individual rights was 32 months in FY 2021, with a median sentence of three (3) months.[10] Looking solely at sentences for individual rights violations, however, does not provide a completely accurate picture of defendants who were somewhat-similarly situated to Mr. Chauvin.

When sentencing for deprivation of individual rights, a Court must craft its sentence based on the guideline for the offense underlying the individual rights violation if the guideline for such offense is higher than that contained in U.S.S.G. § 2H1.1. (PSR at ¶ 58). Here, although there are two separate offenses at issue, one underlying each count of conviction, the controlling underlying offense for the purposes of sentencing is second-degree murder. (*Id.*). The guideline for this offense is U.S.S.G. § 2A1.2. (*Id.*).

In FY 2021, 45 defendants were sentenced pursuant to section 2A1.2 as the primary guideline, and another 49 were sentenced with reference to the section.[11] The average

---

[8] United States Sentencing Commission, *2021 Annual Report and Sourcebook of Federal Sentencing Statistics* (Feb. 17, 2022), at 70. Available from https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/2021_Annual_Report_and_Sourcebook.pdf, last accessed Jun. 7, 2022.
[9] *Id.*
[10] *Id.* at 64.
[11] *Id.* at 70.

sentence for murder nationwide (including the more serious offense of first-degree murder) was 244 months in FY 2021, while the median sentence was 231 months.[12] For offenders who fell into criminal history category I, as Mr. Chauvin does, the average length of a murder sentence (including first-degree murder) was 212 months in FY 2021, and the median sentence length was 184 months.[13] This Court has previously sentenced a defendant in criminal history category III to 236 months' imprisonment for the offense of second-degree murder.[14] Thus, a 240-month sentence in this case falls squarely in the heartland of the offense, and really, is above the sentence a defendant with the same criminal history category as Mr. Chauvin would likely receive. Clearly, however, this case is different. One can rather safely surmise that the vast majority of offenders sentenced in federal courts for second-degree murder in FY 2021 were not already serving a 270-month state sentence for the same crime.

Thus, even on a national level, it is difficult to compare Mr. Chauvin's circumstances with those of other defendants. For example, there certainly cannot be that many defendants serving a state sentence for second-degree unintentional murder who fall into criminal history category I for federal sentencing purposes. Nevertheless, this Court is bound to avoid unwarranted sentencing disparities, and sentencing Mr. Chauvin to a term of imprisonment of greater than 240 months would certainly create a disparity between his circumstances and those of other offenders who fall into criminal history category I and

---

[12] *Id.* at 64.
[13] *Id.* at 81.
[14] *See United States v. Hill,* No. 17-CR-183 (PAM/LIB) (D.Minn. May 16, 2018) at docket no. 79.

have received federal sentences for second-degree murder. A 240-month prison sentence is more than sufficient, but not greater than necessary, to serve the goals of sentencing in this case.

The Defense is fully aware that the Court will come under significant pressure and scrutiny from the public, other branches of government, and interested groups, as it weighs its sentencing decision in this matter. Fortunately, the Defense also shares the judiciary's sentiment that this Court is "one of America's foremost jurists, a longtime leader within the federal judiciary, and a[n]… exemplar of judicial independence." *United States v. Green,* 346 F.Supp.2d 259, 284 (D.Mass. 2004). The Defense is confident that the Court's clear eye toward justice, which it has unflinchingly championed on multiple occasions,[15] will permit it to disregard outside influences and guide it toward the appropriate sentence in this matter.

## CONCLUSION

Application of the 18 U.S.C. § 3353(a) factors and policies reflected in the Sentencing Guidelines, along with the unique circumstances of this case, dictate that a sentence of 240 months' imprisonment, less time served, to run concurrently with Mr. Chauvin's state sentence, and five years of supervised release would be sufficient, but not greater than necessary, to accomplish the goals of sentencing with respect to Mr. Chauvin. Mr. Chauvin, therefore, respectfully requests that this Court sentence him accordingly.

---

[15] *See, e.g., United States v. Langmade,* 125 F.Supp.2d 373 (D.Minn. 2001); *United States v. Kirsch,* 287 F.Supp.2d 1005 (D.Minn. 2003)

24

Respectfully submitted,

**HALBERG CRIMINAL DEFENSE**

Dated: June 22, 2022

/s/ *Eric J. Nelson*
Eric J. Nelson, #308808
7900 Xerxes Ave. S., Ste. 1700
Bloomington, MN 55431
(612) 333-3673
enelson@halbergdefense.com