UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-108 (01) (PAM/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) **UNITED STATES' SENTENCING** ) **MEMORANDUM** |
| DEREK MICHAEL CHAUVIN, | ) ) ) |
| Defendant. | ) ) |

COMES NOW the United States of America, by and through undersigned counsel, and respectfully submits the following memorandum in aid of sentencing. The United States respectfully recommends a sentence of 300 months' imprisonment, within the agreed-upon range set forth in the plea agreement, is reasonable and appropriate in light of defendant Derek Chauvin's grievous offenses and in consideration of the factors set forth in 18 U.S.C. § 3553(a)

First, the crimes here cannot be more serious. The defendant, abusing his police authority, took the life of George Floyd. Second, the defendant's conduct was not isolated: the defendant also hurt a 14-year-old child without justification, when he was handcuffed, compliant, and owed the defendant's protection. Third, neither of these events involved an officer making a split-second decision. Instead, the defendant made a series of deliberate choices—to disregard his training, to ignore the victims' pleas, and to discount the warnings of bystanders. Fourth, in committing these offenses, the defendant did more than injure his victims and cause their families and friends to suffer; he also damaged public

trust in law enforcement and the criminal justice system. For all of these reasons, a sentence of 300 months—25 years—is reasonable and appropriate.

## I. Procedural History

On December 15, 2021, the defendant, former Minneapolis Police Department ("MPD") officer Derek Chauvin, pleaded guilty to two violations of 18 U.S.C. § 242 pursuant to an agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). Specifically, the defendant pleaded guilty to willfully depriving George Floyd of the right to be free from the use of unreasonable force by a police officer, resulting in Mr. Floyd's death, as charged in Count One of the Indictment. ECF Nos. 1, 142. Defendant Chauvin also pleaded guilty to willfully depriving a 14-year-old child ("Juvenile 1") of his right to be free from the use of unreasonable force by a police officer, as charged in Count One of an Information filed on December 15, 2021. ECF No. 139. The defendant admitted that, as charged in the Information, this offense involved the use of a dangerous weapon and resulted in bodily injury to Juvenile 1.

## II. Factual Background

The charges against the defendant arose out of two separate incidents in which he held his knee on the necks of handcuffed and unresisting citizens for more than nine minutes each, even after they cried out in pain and said that they could not breathe, and, in Mr. Floyd's case, even after he became unresponsive and lost a pulse.

### A. George Floyd

On the evening of May 25, 2020, the defendant and his partner, former MPD officer Tou Thao, responded to a dispatch call regarding a counterfeit bill, even though other

officers were already on scene. When the defendant and Officer Thao arrived, former MPD officers J. Alexander Kueng and Thomas Lane had already handcuffed Mr. Floyd and were attempting to seat Mr. Floyd in their squad car. Mr. Floyd expressed his fear of being placed in the car and told the officers he was claustrophobic, and when Officers Kueng and Lane tried physically forcing him into the car, Mr. Floyd began to struggle. Eventually, after Mr. Floyd pushed himself partially out of the squad car and asked to be placed on the ground, the defendant and Officers Kueng and Lane maneuvered Mr. Floyd out of the vehicle and face-down on the street. At 8:19:14 p.m., as soon as Mr. Floyd was face-down on the street, the defendant placed his left knee on the back of Mr. Floyd's neck and his right knee on Mr. Floyd's left arm and upper back, holding Mr. Floyd, who remained handcuffed, in the prone position. Less than one minute into the restraint, Mr. Floyd stopped struggling against the officers. Although Mr. Floyd had stopped resisting, the defendant did not remove his knees from Mr. Floyd's body for the next nine minutes and 29 seconds—including two minutes and 44 seconds after Officer Kueng announced that he could not find Mr. Floyd's pulse.

The defendant has admitted that his continued use of force under these circumstances was objectively unreasonable and excessive, and that in using this excessive force, he acted in callous and wanton disregard to Mr. Floyd's life. Further, the defendant admitted that he knew what he was doing was wrong, in part because it was contrary to his training as an MPD officer. He knew, based on MPD policy and training, that once Mr. Floyd stopped resisting, the defendant should have gotten off of Mr. Floyd and moved him into a side-recovery or seated position. Specifically, the defendant knew that Mr. Floyd—

who pleaded for air, stopped talking, stopped moving, stopped breathing, lost consciousness, and lost a pulse—was no longer resisting and that Mr. Floyd's medical condition was progressively deteriorating. Thus, the defendant knew that there was no legal justification to continue his use of force.

In choosing to continue his use of force, the defendant ignored information that should have triggered both alarm and immediate action on his part:

- Mr. Floyd told the defendant that he could not breathe because of the knee on his neck, and he repeatedly begged the defendant to help him. Mr. Floyd pleaded with the defendant, telling him 25 times that he could not breathe. In particular, the defendant heard Mr. Floyd say, "Please, somebody help me!"; "I can't breathe! Please, a knee in my neck, I can't breathe shit!"; and "My neck hurts. …Everything hurts." Instead of getting off of Mr. Floyd and assisting him, as the defendant had been trained to do, the defendant joked with Mr. Kueng that Mr. Floyd's pleas "take[] a heck of a lot of oxygen."

- Officer Lane asked about rolling Mr. Floyd onto his side as Mr. Floyd's groans became softer. Instead of getting off of Mr. Floyd and assisting him, as the defendant had been trained to do, the defendant responded, "No, he's staying put the way we got him." The defendant then held his knees on Mr. Floyd's body for almost five more minutes.

- Mr. Floyd stopped talking. Had the defendant believed that if Mr. Floyd could talk, that meant he could breathe, the fact that Mr. Floyd stopped

4

talking should have been a red flag. Nevertheless, the defendant continued to hold his knees on Mr. Floyd's body for four minutes and 44 seconds after Mr. Floyd spoke his last words: "Please, man, I can't breathe."

- Mr. Floyd stopped moving. As bystanders on the sidewalk pleaded with the defendant to get off Mr. Floyd because his position was stopping Mr. Floyd's breathing, and warned "you're just gonna choke him like that," the defendant responded by pulling out his cannister of pepper spray, shaking it, and pointing it at the bystanders.

- Mr. Floyd lost consciousness. The defendant held his knees on Mr. Floyd's unconscious body for four minutes after Officer Lane said "I think he's passing out." The defendant continued to hold his knees on Mr. Floyd's body for more than three minutes after Officer Lane again asked, "Should we roll him on his side?" In doing so, the defendant ignored both Officer Lane and the bystanders on the sidewalk, including a woman who stated that she was an off-duty Minneapolis firefighter, who begged the defendant to get off of Mr. Floyd, told the defendant that he was stopping Mr. Floyd's breathing, described Mr. Floyd as "unresponsive," and asked the officers to check Mr. Floyd's pulse.

- Officer Kueng said that he could not find a pulse. The defendant heard Officer Kueng say that he could not find a pulse, yet even then—when this ultimate alarm bell sounded—the defendant ignored this vital information. The defendant failed even to get off of Mr. Floyd's pulseless body, let alone

5

render the emergency medical care, such as CPR, that he had been trained to provide. Instead, the defendant held his knees on Mr. Floyd's body for two minutes and 44 seconds after Officer Kueng announced that he could not find a pulse.

- Paramedics arrived and checked for a pulse. The defendant still did not remove his knee from Mr. Floyd's neck for more than one minute after an ambulance arrived on scene, delaying the paramedics' ability to get Mr. Floyd into the ambulance for treatment. Only when a paramedic gestured to the defendant that it was time to move Mr. Floyd's body onto a stretcher did the defendant take his knees off Mr. Floyd.

Despite all of these alarm bells, the defendant chose not to change course. At no point during the entire period that Mr. Floyd was on the ground did the defendant remove his knees from Mr. Floyd or provide him with any of the medical aid he admits he was trained and required by MPD policy to provide. The defendant's continued restraint of Mr. Floyd, which impaired Mr. Floyd's ability to obtain and maintain sufficient oxygen, and the defendant's failure to provide any basic medical aid to Mr. Floyd, resulted in Mr. Floyd's death.

    **B.**    **Juvenile 1**

On September 4, 2017, the defendant and a second MPD officer who was being trained by the defendant that day responded to a domestic assault call at a residence in Minneapolis. Upon arrival, they spoke with the caller, who reported that her 14-year-old son, Juvenile 1, had held her from behind during a dispute over a cellphone charger, that

6

she had pinched him, and that he had let her go. The trainee officer noted that the mother did not have any physical injuries. After the officers took a report from the mother, she showed them to a bedroom where Juvenile 1 was lying on his stomach on the floor, playing with his phone.

The trainee officer directed Juvenile 1 to stand up, and Juvenile 1 responded, "I'm fine." The trainee officer repeated, "Stand up," and Juvenile 1 sat up and began explaining that his mother was intoxicated and had assaulted him. The trainee officer repeated his instructions and approached Juvenile 1, and Juvenile 1 began to stand up as directed. The trainee officer then grabbed Juvenile 1's arm in an attempt to handcuff him, and Juvenile 1 pulled back, saying, "You can't touch me in my own house!"

Approximately five seconds after the trainee officer grabbed Juvenile 1's arm, the defendant struck Juvenile 1 in the head multiple times with a police-issue flashlight. The defendant then pinned Juvenile 1 to the wall by his throat and again struck Juvenile 1 in the head with his flashlight. Juvenile 1 cried out, "Ow, ow, you're hurting me!" The defendant's strike caused a wound above Juvenile 1's left ear that visibly bled onto the carpet and ultimately required stitches. The defendant admitted that throughout the encounter, he was aware that Juvenile 1 was only 14 years old and knew that Juvenile 1 had made no aggressive moves towards the officers.

The defendant admitted that he then held his knee on Juvenile 1's neck and upper back for between 15 and 16 minutes, while Juvenile 1 was face-down on the floor, handcuffed and unresisting. The defendant held his knee on Juvenile 1's neck for more than six and a half minutes, during which time Juvenile 1 cried, reported three times that

his neck hurt, and twice asked the defendant if he could move his knee to Juvenile 1's back because "my neck really hurts." The defendant moved his knee to Juvenile 1's upper back and held it there for an additional nine minutes, during which time Juvenile 1 remained compliant and unresisting. *See* Exhibits 1 & 2[1] (body-worn camera video of incident). The defendant admitted that both uses of force against Juvenile 1—striking Juvenile 1 with his flashlight and pinning him prone to the ground while Juvenile 1 was compliant—were unreasonable and excessive.

After the incident, the defendant wrote a report about his interactions with Juvenile 1. The defendant omitted from his report that he repeatedly struck Juvenile 1 in the head with a flashlight, grabbed Juvenile 1 by the throat, used his knee to restrain Juvenile 1 by the neck, and pinned Juvenile 1 to the ground for more than 15 minutes. *See* Exhibit 3 (incident report).

### III. Plea Agreement and Presentence Investigation Report

The United States has reviewed the Presentence Investigation Report (PSR) prepared by the U.S. Probation Office. The United States has no objections to the PSR, and agrees that the advisory Guidelines range is life imprisonment. ECF No. 350 ¶¶ 77, 82.

The parties agreed, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a sentence of imprisonment of no less than 240 months and no greater than 300 months, and a five-year term of supervised release, was appropriate. ECF No. 142 ¶ 10. Further,

---

[1] The United States will submit the exhibits to the Court separately.

the parties agreed that pursuant to U.S.S.G. § 5G1.3(b)(1) & (2), the sentence of imprisonment imposed in this case should be served concurrent to the sentence imposed in *State of Minnesota v. Derek Chauvin*, No. 27-CR-20-12646 ("the State case"), and the sentence should be adjusted for any period of imprisonment already served. ECF No. 142 ¶ 10.

In the State case, the defendant received a sentence of 270 months' imprisonment, and assuming all good-time credit, is expected to serve approximately 178 months, or two-thirds of that sentence. The State case did not address the defendant's conduct toward Juvenile 1, and therefore the sentence in the state case did not account for the separate and additional harm the defendant inflicted on Juvenile 1. *See, e.g.*, *United States v. Palkowitsch*, -- F.4th --, 2022 WL 2080162 (8th Cir. Jun. 10, 2022) (affirming 72-month sentence of officer-defendant after he was convicted after trial on one count of violating 18 U.S.C. § 242 for kicking a man three times as he was being bitten and held by a police canine). Sentencing the defendant to the bottom of the agreed upon range in this case (240 months, of which the defendant would be expected to service approximately 204 months after good-time credit) would fail to adequately address the separate conduct against Juvenile 1.

**IV.   Section 3553(a) Factors Support a 25-Year Sentence**

When fashioning an appropriate sentence for a defendant, a court must first consider the applicable Guideline range under 18 U.S.C. § 3553(a)(4). *United States v. Hernandez*, 518 F.3d 613, 616 (8th Cir. 2008). Although the sentencing guidelines are advisory, they are the "starting point and the initial benchmark" for federal sentencing. *Id.* at 616 (quoting

*Gall v. United States*, 552 U.S. 38, 49 (2007)).  Once a court has determined the appropriate sentencing range, it must then consider that range in light of the other relevant § 3553(a) factors.  *Hernandez*, 518 F.3d at 616.

Here, the Court has accepted the 20- to 25-year sentencing range.  ECF No. 333.  In order to arrive at an appropriate sentence within that range, the Court must consider several factors, including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; and (4) adequate deterrence of criminal conduct and the protection of the public.  18 U.S.C. § 3553(a).  Section 3553(a) then requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with these purposes.  *Id*.  Consideration of the 3553(a) factors here demonstrates that a 300-month sentence is most consistent with these purposes.

### A.      The Nature and Circumstances of the Offense

The first § 3553(a) factor courts consider is the "nature and circumstances of the offense."  18 U.S.C. § 3553(a)(1).  The nature and circumstances of the defendant's conduct warrant a 300-month term of imprisonment.

The defendant's actions were, in Mr. Floyd's words, "cold-blooded."  The defendant pinned Mr. Floyd to the street and squeezed the breath out of him, slowly killing him over the course of nine and a half minutes, during which time Mr. Floyd begged for help.  Mr. Floyd understood that the defendant was killing him as it was happening ("I'm about to die;" "Please, a knee in my neck, I can't breathe;" "They're gonna kill me, they will kill

10

me, I can't breathe."), but Mr. Floyd's pleas failed to move the defendant. Indeed, nothing moved him from his position on top of Mr. Floyd, and nothing moved him to acknowledge the suffering of the fellow human beneath his knees: not Mr. Floyd's own frightened entreaties, not the growing alarm of the bystanders, not the statements of his fellow officers that Mr. Floyd had passed out and that they could not find a pulse, and not Mr. Floyd's still and lifeless body. The defendant's actions were also cold-blooded because they were needless. Mr. Floyd was handcuffed the entire time, and after less than a minute on the ground, he stopped struggling.

The defendant's actions toward Juvenile 1 were equally unjustified. Juvenile 1, a child of 14 at the time, initially questioned the officers' reasons for arresting him, tried to explain that his mother was intoxicated, and pulled away when the defendant's partner tried to handcuff him. Instead of taking a moment to answer Juvenile 1's questions, the defendant responded by pinning Juvenile 1 to the wall by his throat, striking Juvenile 1 in the head with a police-issue flashlight, and pressing his knee into Juvenile 1's neck and upper back for more than 15 minutes. As with Mr. Floyd, once the defendant pinned Juvenile 1 to the ground, the defendant remained in that position, even though Juvenile 1 was compliant, cooperating with police directions, and at times, crying from fear and pain. Throughout both incidents, the defendant appeared unable or unwilling to recognize the humanity of the people under his knees—a compliant young teenager and a frightened man calling out to his loved ones—no matter how many minutes passed, no matter how completely the people beneath him complied, no matter how anguished their cries of pain

and fear. The nature and circumstances of these offenses weigh in favor of a 300-month sentence.[2]

### B.     The History and Characteristics of the Defendant

Section 3553(a)(1) also directs courts to consider "the history and characteristics of defendant." One of the most salient features of the defendant's history is that he served as a law enforcement officer for more than 18 years. Although a lengthy term of public service often serves as a mitigating factor at sentencing, this characteristic is aggravating in this case, as the defendant's history involved more than one abuse of his official position. *See United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position.").

Indeed, the defendant used his law enforcement career to engage in abusive conduct in which the defendant punished those who did not instantly submit to his authority. This can be seen in both counts of conviction, in which the defendant reacted to Juvenile 1's questions about why the officers were arresting him, and to Mr. Floyd's fear of being placed in a police squad, by pinning Juvenile 1 and Mr. Floyd to the ground and kneeling

---

[2] In addition, pursuant to U.S. Sentencing Guideline § 3D1.4(c), the total offense level "disregard[ed]" the incident involving Juvenile 1 for guideline calculation purposes, because the offense level for this count was more than nine levels lower than the offense level for the incident involving Mr. Floyd. *See* ECF No. 332 ¶ 73. As this count did not increase the defendant's offense level, it can and does instead support a sentence at the high end of the agreed upon sentencing range. *Cf.* § 3D1.4(c) (noting that such a situation "may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level").

on their necks long after they were compliant. Both incidents demonstrate that the defendant willfully used unreasonable force without regard for the life and safety of members of the public he was charged with protecting.

### C. The Seriousness of the Defendant's Offenses, Promotion of Respect for the Law, and a Just Punishment

Section 3553(a) also directs the sentencing court to consider the need for the sentence "to reflect the seriousness of the offense, promote respect for the law, and to provide for a just punishment." 18 U.S.C. § 3553(a)(2)(A). A 300-month sentence appropriately captures the seriousness of the defendant's abuses and the lasting harms that he has inflicted on his victims, their families, and the larger community.

No harm can be greater than the harm the defendant perpetrated against Mr. Floyd: he took Mr. Floyd's life. The defendant's offenses against Mr. Floyd and Juvenile 1 were also of the utmost seriousness because the defendant committed these acts of violence against people in his custody and care. The defendant abused the power of his position when he took Mr. Floyd's life and hurt Juvenile 1 without justification. As a police officer, he had a special responsibility for both Mr. Floyd and Juvenile 1's safety because they were in his custody. They were handcuffed; they could not get themselves medical care; and they could not defend themselves against illegitimate force.

Instead of protecting Juvenile 1 and Mr. Floyd as the defendant's badge and oath required, he injured Juvenile 1 and took Mr. Floyd's life. The defendant's position of authority also prevented others from stepping in to save Mr. Floyd and protect Juvenile 1. Although the bystanders on the sidewalk feared for Mr. Floyd's life, and they called out to

13

the officers to get off of him and aid him, the defendant's police authority prevented the bystanders from taking physical steps to intervene. The defendant shook his cannister of pepper spray at them, warning them that if they approached, he would use force on them. And in addition to risking physical injury, the bystanders risked arrest and criminal prosecution if they acted. Similarly, Juvenile 1's mother witnessed the defendant's conduct and warned, "Y'all are hurting my son . . . [c]an you get your knee off my son . . . you already got him in handcuffs. Please take your knee off my son." Despite her concern and increasing distress, because of the defendant's position as a law enforcement officer, she could not physically intervene to aid her son without risking potentially severe consequences.

The defendant's offenses—the murder and abuse of individuals in his custody—are offenses both against the individual victims and against the criminal justice system itself because this type of criminal conduct by a law enforcement officer undermines public trust in our system of justice. Numerous courts have held that crimes committed by law enforcement officers are ones that courts should treat more seriously, not less seriously, than other types of criminal acts. *See Thames*, 214 F.3d at 614; *see also United States v. McQueen*, 727 F.3d 1144, 1157 (11th Cir. 2013) (reversing a below-guidelines sentence in an excessive force case as "a clear error of judgment" because such a crime is a "particularly serious offense"); *United States v. LaVallee*, 439 F.3d 670, 708 (10th Cir. 2006) ("[I]n many instances, committing a crime while acting under color of law will result in a higher sentence – as it did in this case – rather than a lower sentence.").

**D.    Deterrence and Protection of the Public from Further Crimes**

Protecting the public and deterring additional criminal conduct is the fourth factor courts are directed to consider under Section 3553(a)(2)(B)-(C). This Court will ensure public safety by sentencing the defendant to a 300-month sentence of imprisonment. The defendant will never again serve as a law enforcement officer, and thus, the need for a sentence to protect the public against future, similar crimes by this defendant is not at issue here. However, "Congress specifically made general deterrence an appropriate [sentencing] consideration under [S]ection 3553(a)(2)(B)," and the Eighth Circuit has "described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)). A sentence at the top of the plea range will serve as a reminder to other officers that although they undoubtedly have a difficult job, and one that sometimes carries life and death responsibilities, their role in our criminal justice system is a limited one, and does not include imposing punishment. A 300-month sentence will thus serve to protect the American public by deterring additional crimes and promoting respect for the law.

**V.    Conclusion**

For these reasons, the United States respectfully submits that the defendant should be sentenced to 300 months' imprisonment, to be followed by five years of supervised release on Count One of the Indictment, to run concurrently with a term of three years of

supervised release on Count One of the Information. *See* 18 U.S.C. § 3624(e) (multiple terms of supervised release shall run concurrently).

Dated: June 22, 2022 Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*/s/ LeeAnn K. Bell*
BY: LEEANN K. BELL
Assistant U.S. Attorney
Attorney ID No. 318334

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Samantha Trepel*
BY: SAMANTHA TREPEL
Special Litigation Counsel
Attorney ID No. 992377 DC