TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

EXH-A   1 of 11

---------------------------------------------------------------------------------

RECEIVED
BY MAIL

NOV 1 3 2023

CLERK, U.S. DISTRICT COURT
ST. PAUL. MN

FROM: Schaetzel, William
TO: 47849509
SUBJECT: RE: info
DATE: 03/10/2023 12:36:06 AM

Derek-
When you mentioned you were trying to reach Nelson, I decided to email him myself. I have never been able to speak with him. The email I sent to him was to alert him that you were trying to contact him. I then attached that three or four-page explanation that I first sent you. I am hopeful that he got it and read it. I know your telephone time is limited.

When I spoke with Morhman, he was truly interested. He said; "This is the first time anyone has told or explained this to me." He told me he had little hope the Appellate Court in Minnesota would overturn your conviction. However, he thought that the Supreme Court would almost certainly overturn it. He then asked if you were to get a new trial, would I be willing to be an expert witness? I'm a coward, but if he can't a braver soul...I'll have to drag myself in there. Otherwise, I couldn't live with myself.

Following your trial, I wrote to the medical director of NMS labs and requested that they inventory and sequester anybody fluids from Mr. F they had remaining. I did not get a reply, but I know they got it because it was sent by FedEx, and I have the tracking number somewhere. One thing I would ask Nelson to do is to ask NMS labs if they did any other analysis other than what Nelson had. They probably couldn't tell what the results were or the names of the tests they did, but maybe they could confirm or deny if Nelso had all the tests. If they won't tell him, then maybe he could ask to see the bill NMS billed the Medical Examiner's office for Floyd's Toxicology analysis. The bill should list what they did, and I would think Nelso could look at that through a Freedom of Information Act petition. Wouldn't it be something if they did the tests and didn't give them to Nelson? As crazy as the fury was to convict you, there is a distinct possibility that they may have. I wouldn't be surprised.

I also wrote to the President of the Pheochromocytoma/ paraganglioma foundation and asked her to write a press release stating and asking to have Floyd's body fluids analyzed. I told her it would bring light to her organization with knowledge and awareness of the condition to the public. According to her website, that's what the purpose of her organization is all about. I never received a reply. I guess I was wrong about the goal of her organization.

DEREK MICHAEL CHAUVIN on 3/9/2023 1:08:16 PM wrote
I have already contacted a former coworker who keeps in contact with at least two of the others. I advised him to notify them and their lawyers regarding the information. I have a mailing address for one of the others. You certainly could send the documents directly to him to discuss with his lawyer. I would be certainly be able to reimburse you for the mailing expense.

I spoke to Mr Mohrman regarding the medical information. You had done so as well from a previous email. I have emailed the other lawyer Mr Nelson to arrange a phone call. Not sure when I will be able to speak with him. A fear I have is that the M.E. sent off samples and then destroyed what was left to cover himself. NMS Labs could have only checked for toxicology purposes and skipped assaying for anything else if not directed to do so. But mere speculation at this point. When I do speak with Mr Nelson I will relay all the medical information provided. Would he be able to contact you directly as well? Or if he is able to call here at a scheduled time in the afternoon Monday-Friday, you could be added to a conference call from his end if your schedule permits. Typically they call here around 12:00-12:30 which would be 1:00-1:30 Central Time. But an earlier or later call could probably be arranged. Thanks.

The mailing information is:

J Alexander Kueng
43877-509
FSI Correctional Institution Elkton
Po box 10
Lisbon, OH 44432
-----Schaetzel, William on 2/25/2023 12:21 AM wrote:

>

Derek-
I can only imagine how hard life is for you. The trouble I harbor is that I know they convicted innocent men. I don't know if you can communicate with the other officers, but if you do, please feel free to share the information I gave you. They must be confused as to why Mr. F died as well. Maybe their attorneys can get the assays done. If you talk with Nelson, your first

SCANNED

NOV 1 3 2023

U.S. DISTRICT COURT ST. PAUL

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E     EXH-A    2 of 11

--------------------------------------------------------------------------------

defense attorney, you might ask him to call NMS labs and ask if they did any other tests other than what he was given.  If they did the catecholamine levels and the Prosecution suppressed that information.....well that would be something.

Consider yourself free to call me whenever you feel the need.  Weekday mornings are not the best because that is when most surgeries are performed, and sometimes I have to go up to the operating room to examine a tumorous tissue to decide if its cancer or not.  But you could even try then, but it might be hit and miss

Keep the faith,

Bill.

DEREK MICHAEL CHAUVIN on 2/23/2023 4:06:04 PM wrote
The reply emails would only allow a handful of characters.  The reason they look like a Japanese Haiku.

I think there was pressure to say the "right" diagnosis and not anything contrary to what the politicians/media would accept.  Isn't there something regarding medical ethics that M.D.'s are supposed to follow?  As in if someone had a cancerous tumor or another medical condition they can't pretend it doesn't exist and everything is fine.  Plus Dr Bakers' statement that if Floyd was found dead at home with no one around and no other apparent causes it would be ruled an OD.  So in other words there is NO medical evidence of anything but an OD based on what WAS included in the autopsy..  Of course nothing at all regarding the paraganglioma.  But since there is public pressure it MUST be something else.

I think that is a good idea to reach out to other docs to get some further medical opinions.  Especially from a pulmonologist, cardiologist, and toxicologist.  Maybe even someone who would deal with human anatomy/physiology and the effects of various body positions such as prone vs supine may have on overall body functioning.  The state called two of those specialties.  Plus another retired pathologist that trained Dr Baker and an ER doc that does trainings with cops in Kentucky.  They didn't have a toxicologist testify.  I had a retired ear/nose/throat doc write to me saying Dr Tobin's notion of the upper airway closing to the size of a straw from "neck" pressure is beyond their training/experience.  I guess a nice way of saying it is false.  Another PhD doc wrote discussing there would be no/minimal effect from body weight from someone my size with a prone subject.  They included six citations from various medical journals.  I don't have internet here so if you have some names/addresses to pass along I can start writing them.  If you decide to send a letter or contact them as well that would be very good too.

If we are more available for phone calls next week would I be able to call you?  If so when might be a good day and time?  Thanks again for the help so far.  Not many people even willing to do that.

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E      EXH-A    3 of 11

---------------------------------------------------------------------------------------------

FROM: Schaetzel, William
TO: 47849509
SUBJECT: note i sent to Lane and Kueng
DATE: 06/08/2023 09:06:09 PM

Dear Officer                                      June 1, 2023

I had the unfortunate opportunity of watching Derek Chauvin's trial while recuperating from surgery at the Mayo Clinic. I say it was unfortunate for me because I am perhaps the last person in the World who would want to bring this information to light. I have practiced medicine for forty years and have only had to testify in court once. But, unfortunately for me. knowledge is a bit like Pandora's box; you can't unlearn it once you know something. Thus I find myself knowing something about Mr. Floyd, which is specialized knowledge. This has placed me in a rather uncomfortable position, not unlike Moses standing before the burning bush, saying, "Not me, God, I am not good with words.  Please choose someone else".

For the past two years, I have tried to get "someone" else to lead and champion this cause. But, unfortunately, it appears there is no one. Then I am faced with that difficult question. if not me, who?  I write only to inform you of this special knowledge and hope you will read, investigate and educate yourself.

Watching the trial as a pathologist, I was immediately drawn to the Medical Examiner's autopsy report on Mr. George Floyd.  In reviewing Dr. Baker's report, I noted Mr. Floyd was found to have an unusual tumor in his pelvis called a paraganglioma. BOOM!  I immediately searched the rest of Dr. Baker's report for the assay levels of the most potent hormone in the body, which this tumor is known to produce. But, unfortunately, there is no mention of those values.  Those hormone levels were inexplicably not assayed.

I am at a total loss to comprehend If Dr. Baker was intelligent enough to diagnose a paraganglioma, he certainly would have known its significance. I would have thought that finding a paraganglioma in a person who died suddenly would have been the number one likely cause of death until proven otherwise.

Paragangliomas produce abnormally high levels of catecholamines, typically either adrenaline or noradrenaline.  These hormones are so biologically potent molecules that we measure their levels in picograms.  A picogram is one trillionth of a gram. We all know the symptoms of circulating adrenaline when angry or scared.  But paragangliomas don't secrete normal physiological amounts but often at a multiple of normal amounts.  Unlike a ticking time bomb, they can be set off by emotional or physical manipulation.  When the tumor releases these excessive amounts, the person experiences a catecholamine crisis.. The symptoms and sheer terror a person experiences during a crisis is something; thankfully, we will never experience or be able to comprehend.  These people are literally scared to death.

When such elevated levels of catecholamines circulate through your body, the excess amount can cause multiple organ failures.  For instance, not unlike the lawnmower that begins to lose power and sputter when too much gasoline floods the carburetor, the heart loses its ability to contract and pump blood.  This type of heart failure incited by excessive catecholamines is called Takotsubo's myocarditis.  When the heart fails to pump blood, the blood from the lungs leading to the heart, backs up. This increased pressure in the pulmonary vasculature causes the liquid portion of our blood to leak into the pulmonary tissue and alveoli.  With the increased fluid in your alveoli (tiny air sacs), the oxygen and carbon dioxide have difficulty getting through. With dropping oxygen levels and rising carbon dioxide levels in our blood, we have the sensation that we can't catch our breath.

This is, in a nutshell, what, in my professional opinion, happened to Mr. Floyd..  If you watch Officer's Lane and Kueng's body cam recording, knowing Mr. Floyd had this ticking timebomb, you can watch the catecholamine crisis unfold from start to finish. There is no doubt, in my opinion, that Mr. Floyd died as a result of a catecholamine crisis after being startled by Officer Lane, which then precipitated Takotsybo's myocarditis (acute heart failure) with resultant pulmonary edema and death.

Knowing that Mr. Floyd has a paraganglioma while standing outside the squad car, he is, in my opinion, likely moribund. Moribund means that death is inevitable no matter what you do to treat the patient.  Standing by the squad car and telling us he can't breathe, Mr. Floyd tells us his heart failure has caused pulmonary edema, and he is critically ill, just moments away from death.

In all truthfulness, there are some cases of Takotsubo's myocarditis patients who have survived. However, to my knowledge, all those cases were in already hospitalized patients with a known catecholamine-producing tumor. So you see, even if Mr.Floyd had made it to the hospital alive, he almost certainly still would have died. Mr. Floyd would have, at presentation to the Emergency Room, now had critically low blood pressure due to heart failure (caused by the excessively elevated catecholamine

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E        EXH-A    4 of 11

--------------------------------------------------------------------------------

levels.) Typically in such an emergency, the treating physician seeks to raise the blood pressure by administrating adrenaline, the very cause of Mr.Floyd's cardiovascular collapse.. Additional Adrenaline is contraindicated in patients with Takotsubo's disease and if administred, would have likely sealed Mr. Floyd's fate.

In retrospect, knowing Mr. Floyd harbored an occult paraganglioma makes all the difference.  Now with the knowledge of the cardinal signs of a catecholamine crisis, one develops an entirely different narrative while watching the police body cam videos, culminating in Mr. Floyd's death. Below are some of the critical events and symptoms of a catecholamine crisis to observe when you watch the complete arrest from start to finish, often described by Mr. Floyd himself.

1. Officer Lane startles him setting off the paraganglioma.

2. Mr. Floyd doesn't follow directions and appears confused.

3. Mr. Floyd has an unrealistic fear that Lane is about to shoot him.

4. Mr. Floyd falls due to muscle weakness after getting out of his car.

5. While sitting handcuffed by the nearby building, officer Kueng asks Mr. Floyd if he knows why they handcuffed him. Mr Floyd states, "No, why?"  Officer Kueng then tells him he wasn't following their directions.  Mr. Floyd then says, "Man, I didn't know what was going on" (mental confusion)

6. Once Officer Kueng stands him back on his feet, Mr. Floyd fails again (muscle weakness)

7. Being escorted by Officer Kueng to the squad car, Mr. Floyd states, "It's better now; I can try to relax."

8. When Officer Kueng tells him they are going to put him in the squad car's back seat, Mr. Flyod states he has "Just one problem."  When one of the Officers asks Mr. Floyd's former girlfriend why he is acting this way, she says and motions, "he has something going on," while circling her finger around her ear (a sign of being crazy). Patients with catecholamine-producing tumors frequently have psychiatric problems and are drug seekers.

9. Arriving outside the squad car Mr. Floyd appears terrified.  He repeatedly states he has claustrophobia and anxiety. Yet, just minutes before, Mr. Floyd felt comfortable in his car with two other occupants. What has changed?(adrenaline/ noradrenaline surge-catecholamine crisis)

10. Mr. Floyd expresses an abnormal fear of getting into the squad car, stating, "Man, I'll die if I get in there." Mr. Floyd falls again. (Muscle weakness) (The heart is composed of smooth muscle.  If Mr. Floyd's skeletal muscle is so weak, you can surmise what is happening to his heart muscle)

11. Mr. Floyd is terrified of suffocating in the car, and Officer Kueng states he will roll down the windows and turn on the air conditioning for him.

12. Mr. Floyd begs Officer Kueng not to leave him alone in the car.   Then Mr. Floyd states for the first time, "I can't breathe."  (He is now moribund.)

13. Once pushed into the car, Mr. Floyd shrieks, "I can't choke..I .I.. I can't breathe. (Hysteria)

14. Once removed from the car and placed on the ground, Mr. Floyd states, "I'm going down." (Possibly, this statement reflects Mr. Floyd sensing lightheadedness or hypotension)

15. Shortly after being placed on the pavement, Mr. Floyd voluntarily or involuntarily urinates, which runs towards the curb. (Common agonal response)

16. Officers Lane and Kueng notice Mr. Floyd's nystagmus and postulate that Mr. Floyd is high on PCP (rapid side-to-side movement of the eyes) (nystagmus is a nonspecific neurological sign, which can be seen when the midbrain is not being perfused optimally and other conditions.)

17. Mr. Floyd is now horizontal and prone, accelerating the accumulation of pulmonary edema from heart failure and the sensation that he can't breathe.  Mr. Floyd asks to stand upright.  Patients with chronic heart failure frequently sleep sitting

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

--------------------------------------------------------------------------------

up in a chair.  In this upright position, the patient uses gravity to help drain the pulmonary vasculature towards the heart.

18. Although restrained, Mr. Floyd appears freely able to breathe and verbalize that he can't breathe

19. Carefully observing Mr. Floyd once on the pavement, he now gunts and breathes similarly to people with Chronic Obstructive Pulmonary Disease (COPD).  People with COPD frequently purse their lips while exhaling, causing a slight back pressure in their airway, thereby keeping the lung's microscopic air sacs (alveoli) open longer.  This ever so slight of backpressure helps to oxygenate their blood better.

20.. Near death, Mr. Floyd declares himself dead and tells us to tell his children he loves them.  Then possibly hallucinating, Mr. Floyd calls out repeatedly momma, momma

21. Mr. Floyd states, "This is how my dad died" (25% of paragangliomas are inherited)

22. Mr. Floyd then expires when either Officer Lane or Kueng states, "I think he is passing out," as he feels Mr. Floyd relax.

23. Approximately 30 seconds later, Mr. Floyd's leg involuntarily contracts and jerks, a typical agonal response as the musculature depolarizes and relaxes.

24. A minute or two later, the EMT and ambulance arrive.

I have no doubt that Mr. Floyd expired due to his Paraganglioma and the subsequent consequences of a catecholamine crisis. I am simply at a loss to explain why the physicians that testified at trial did not know or understand the significance of this tumor. You don't have to be a physician to Google search "Paraganglioma and Sudden Death." However, perhaps because of my experience as a pathologist and witnessing the consequences of minor manipulation of an undiagnosed paraganglioma during surgery, I may have the expertise and insight that those other physicians didn't have.  The only way a paraganglioma can be considered an incidental finding is when the decedent's body fluid analysis shows average levels of catecholamines.

The four Minneapolis Officers convicted for their roles in causing Mr. Floyd's death deserve the right to assay the differential catecholamine levels and their metabolites and review the tissue sections of the heart, the results of which I believe would likely be exculpatory evidence.  The values produced by a machine (GC/Mass spect) so sensitive it measures the values in a trillionth of a gram are not subjective.

I hope that this letter finds you well.  You should discuss with your attorney Minnesota statute 590. "POST CONVICTION RELIEF". This act would allow you to test those catecholamine levels, which in my opinion, might exonerate you.

Sincerely;


William Schaetzel D.O. M.S. FCAP
Laboratory
1500 SW 10th
Topeka, Kansas 66604

CC:
Derek Chauvin
Thomas Lane
J. Alexander Kueng
Tou Thao

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

---------------------------------------------------------------------------------------------------

FROM: Schaetzel, William
TO: 47849509
SUBJECT: RE: I haven't forgotten
DATE: 07/19/2023 08:36:12 PM

Derek-
When I read the autopsy report, I noticed that Dr. Baker was dictating his findings like someone normally would document that there was no physical evidence of asphyxia or significant trauma. The report is weird because he describes the areas that usually would have contusions or ecchymoses as normal or unremarkable in someone who was physically asphyxiated or beaten to death. So it is analogous to reading an article about healthy eating habits and discussing fruits and vegetables. You think the author is about to conclude everyone should be a vegetarian, but instead they state you shouldn't forget to eat a Big Mac with a large fry. You read that conclusion and wonder, where did that come from?

In other words, the reader of the Final Anatomical Diagnosis of the autopsy report is left scratching their head, wondering how he concluded that the cause of death was homicide when he didn't have any of the usual gross or microscopic findings to support his conclusion.
So I think his original (preliminary) report likely stated that the cause of F's death was indeterminate (because he was ignorant about paragangliomas). But the D.A. strongly encouraged him the change his conclusion during their meeting. They could make him change his decision, but they couldn't make him change the body of his report and document things he didn't see.

In short, the body of the report doesn't fit nicely with his conclusion. However, any knowledgeable and sane pathologist would agree that a natural death should have been determined. Then all the Baker's findings at autopsy: the paraganglioma, cardiomegaly, hypertension, accelerated atherosclerosis, cardiovascular disease, bilateral dilated ventricles, and pulmonary edema, all fit nicely with the clinical history and the conclusion.

Dr. Bill

DEREK MICHAEL CHAUVIN on 7/19/2023 5:53:56 PM wrote
I guess another question is does the autopsy report on its face even discuss or lead to an asphyxia diagnosis/conclusion whatsoever?  If not would the title even be incongruent with the contents?  From a pure medical perspective I am asking.
-----Schaetzel, William on 7/18/2023 8:21 PM wrote:

>

I haven't forgotten you or the other officers, but rather don't have anything new to report.
I'm still thinking of you guys....
Dr. Bill

TRULINCS 47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E        EXH-A   7 of 11

---------------------------------------------------------------------------------

FROM: Haney, Paul
TO: 47849509
SUBJECT: RE: question
DATE: 07/21/2023 08:21:11 PM

I think the autopsy provides evidence that hypoxia was not present before death because of the lack of sickling. There is no clear cut evidence for asphyxia as well as evidence of no major or minor trauma about the neck. There is clear evidence that subsequent testing to further rule out other causes were not done. And I am told that the original autopsy report title was changed after the FBI meeting and the other family pathologists made statements. My guess is that he was told that if he plays their game and follows their rules that they would get the military pathologists to back him up... which they did. They did not mention the sickling and paraganglioma.

I made a call into Congressman Jim Jordan's office today since he is on a committee investigating FBI involvement into the Weiner coverup, Epstein coverup, Hunter Biden coverup, Big Tech censorship/election tampering, etc. (Now it is spreading like a contagion to the Secret Service with the cocaine in the White House coverup) I believe your case was an FBI red flag. They just wanted a racial death during police custody to further their narrative of racial division. Unfortunately, Floyd had the paraganglioma and sickle trait which they had to cover up with multiple false witnesses as well as hiding the body cam footage.

I had a rough call last week and this week. I'm off tomorrow for first day in 2 weeks. I need it and my boys actually stayed home with us tonight which was nice. I am really starting to think that big pharma has sooo much control of the medical industry now that they are recommending toxic doses of meds to create more problems to drive more demand. I had a 27 year old female 2.5 weeks post-partum present with a bowel obstruction from an umbilical hernia. Her white blood cell count was high and her c-section incision looked a little red. By policy, the ER docs order blood cultures--many of which turn up contaminated, but they really didn't need to. And yes one of them came back positive (1 of 2). So they want to reculture but cover her with antibiotics just in case. So they place her on Vancomycin which can be toxic to the ears and kidneys. The pharmacy is to dose it per protocol. Usually we start with 1 gm every 12 hours and check levels before the third dose. Now the new protocols are based more on weight, age, and glomerular filtration rates. Anyway, she was being taken care of by a "nurse", who in my opinion should have been fired a long time ago but they won't because of the "shortage" and they don't want to increase wages. Anyway, she gives 2 gms and then another 1.5 gm 5 hours later. The next shift nurse (night nurse) with even less experience starts the 3rd dose without checking the vanco level. Yes, the new mom went into renal failure. I'm sMH and crying. This should be a never event. And we found out it was a contaminant. The nurse is from another country and just got her nurse practitioner's license....SMH. I think the pharmaceutical companies are pushing higher dosages, policies, protocols, etc that make medicine dangerous. Same thing with blood clots and anticoagulation. I saw covid patients over anticoagulated in the ICU and die of bleeding. We used to be a good hospital, but I think our administrators want their bonuses more than quality healthcare. Do you understand what I am saying?

Shabbat Shaloam and don't get sick ;)

DEREK MICHAEL CHAUVIN on 7/19/2023 9:05:47 PM wrote
I guess from a pure medical perspective does the autopsy report even mention or show that an asphyxia took place? If not would the title then be incongruent with the body of the report? As if the title is slapped on after to sound good but be kind of vague.

EXH-A   8 of 11

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

--------------------------------------------------------------------------------

FROM: Mohrman, William
TO: 47849509
SUBJECT: RE: information needed
DATE: 08/08/2023 08:36:18 AM

Derek:

Here are the answers:

What was the exact date a petition to the MN Supreme Court was filed?  May 17, 2023.

Can you advise again of the issues raised in that appeal in case any were changed out please?  None.

Do you have further access to have documents from the state trial discovery sent here including trial exhibits?  If so could documents be sent here?  I have the documents admitted into evidence.  I do not think I have all of the discovery documents. The appeal is based on the record of documents submitted to the trial court.

Would you be able to look up the exact dates in the federal case for the original indictment/arraignment and the date for the change of plea hearing and advise me of those dates?  I was told this could be looked up under WWW.PACER.GOV for 21-CR-108 under my name and number of 47849-509.  Indictment May 6, 2021 - Unsealed May 7, 2021.  You entered a guilty plea on December 15, 2021.

Would you also be able to look up the specific date for the actual judgement filed in federal court for the criminal case?  It should be on or after July 7 2022?  This would have been the sentence date.  Sentencing judgment was entered on July 7, 2022.

I received some vague information on a possible amendment to a judgement filed sometime in May 2023.  Could you look up that exact date for that item?  Also did the language read it is an "amended judgement"?  Amended Sentencing was entered on May 9, 2023.

Would you mail a copy of the petition for the MN Supreme Court filing as I don't believe I have that?  Would you also mail the copy again of the MN Court of Appeals filing?  I had mailed some pages back to your office some time ago and don't have the complete packet.  Yes.

Would you also look up and mail the exact statute descriptions directly from the MNREVISOR website for second degree murder, third degree murder, second degree manslaughter as well as third degree assault along with definitions that would be contained within such as great bodily harm, substantial bodily harm, etc?  These would be found under chapter 609 criminal code.  Yes.

When you be available to discuss other matters on a phone call?  Of course

Thanks for reading and hope to hear back soon.

DEREK MICHAEL CHAUVIN on 7/19/2023 6:24:57 PM wrote
I was looking for several items of important information to move forward with.

What was the exact date a petition to the MN Supreme Court was filed?

Can you advise again of the issues raised in that appeal in case any were changed out please?

Do you have further access to have documents from the state trial discovery sent here including trial exhibits?  If so could documents be sent here?

Would you be able to look up the exact dates in the federal case for the original indictment/arraignment and the date for the change of plea hearing and advise me of those dates?  I was told this could be looked up under WWW.PACER.GOV for 21-CR-108 under my name and number of 47849-509.

Would you also be able to look up the specific date for the actual judgement filed in federal court for the criminal case?  It should be on or after July 7 2022?  This would have been the sentence date.

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

---------------------------------------------------------------------------------------

I received some vague information on a possible amendment to a judgement filed sometime in May 2023.  Could you look up that exact date for that item?  Also did the language read it is an "amended judgement"?

Would you mail a copy of the petition for the MN Supreme Court filing as I don't believe I have that?  Would you also mail the copy again of the MN Court of Appeals filing?  I had mailed some pages back to your office some time ago and don't have the complete packet.

Would you also look up and mail the exact statute descriptions directly from the MNREVISOR website for second degree murder, third degree murder, second degree manslaughter as well as third degree assault along with definitions that would be contained within such as great bodily harm, substantial bodily harm, etc?  These would be found under chapter 609 criminal code..

When you be available to discuss other matters on a phone call?

Thanks for reading and hope to hear back soon.

EXH-A  10 of 11

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

---------------------------------------------------------------------------------------------

DEREK MICHAEL CHAUVIN on 8/14/2023 1:36:31 PM wrote
You previously wrote that emails were sent in an attempt to contact the state prosecutors office, medical examiners office, and the office for Nelson.  Would you still have any outgoing messages to any of the offices in the sent email box?  Not sure how long messages might stay for each type of email provider.  Or if nothing from the time of trial, would there be anything sent after the fact?  Let me know when you can please.  Thanks.

TRULINCS  47849509 - CHAUVIN, DEREK MICHAEL - Unit: TCN-S-E

---------------------------------------------------------------------------------

FROM: Schaetzel, William
TO: 47849509
SUBJECT: RE: email
DATE: 08/14/2023 04:21:06 PM

Derek-

I found one of the emails I sent out.  It was sent 4/17/21 and was emailed to: citizeninfo@hennepin.us, 4thjudgeCahillChambers@courts.state.mn.us, joan.jung@hennepin.us, and enelson@halbergdefense.com  Here is the exact (with all the mispelled words) that was sent.

I am Dr. Bill Schaetzel, a community pathologist from Topeka, Kansas.  I am in town after receiving medical care at Mayo Clinic.  While convalescing I was watching the trial of Mr. Chauvin.  I reviewed the autopsy report signed by Dr. Baker.

I noted in the autopsy report that Mr. Floyd had a Paraganglioma.  I could not see where a metanephrine level was done on Mr. Floyd's body fluids.  I know that Dr. Baker stated that the Paraganglioma was an incidental finding.  That would be true only if his metanephrine levels were normal.  Unfortunately I don't have access to the medical record and can't see if they were in fact preformed.

Patients with Paraganglioma are at a significant risk for sudden death.  If someone pushed on the tumor or if it was manipulated during the altercation with police, a sudden release of Norepinephrine could have caused a fatal arrhythmia with acute heart failure.  Since Mr. Floyd's tumor was near his belt line, this tangerine sized tumor could have been easily compressed when Mr. Floyd resisted getting into the patrol car.  That would have caused a sudden surge of catecholamines into his bloodstream, causing a feeling of doom and claustrophobia.  The surge of catecholamines could have precipitated Takotsubo cardiomyopathy (broken heart syndrome), which would have caused sudden acute heart failure. Within minutes, Mr. Floyd would have been developing pulmonary edema and experienced difficulty in breathing.

Stricken with this surge of catecholamines Mr. Floyd would have become confused, delirious, panicky, with an overwhelming sense of doom.  Mr. Floyd's desire to lie down was not the best choice for someone with acute heart failure.  Lying prone on the ground would just increased his pulmonary edema and difficulties breathing.  In the prone position Mr. Floyd's Paraganglioma was between the asphalt and his Psoas muscle.
When officers then knelt on him they would have further compressed the tumor, releasing more catecholamines which may have caused sudden cardiac spasm and seizure with asystole and sudden death.

This possible senario would explain the autopsy findings of Pulmonary edema, and hypertensive cardiac disease with the history of chronic back pain, and clinical findings of sense of panic, doom, claustrophobia, difficulty breathing and sudden death.

I do not have a horse in this race.  I do not want to step on Dr. Baker's toes.  He has a tough job and I know it. I want only justice.  If the metanephrine and catecholamine levels were preformed, I would appreciate if you would publish them.  If by chance they have not been done, please do so.

Please protect my identity.  I do not wish to become famous.

Let justus be served;

Dr. Bill Schaetzel
Pathologist
785-760-5425


Derek; after I got no responseto my email, I then started calling the parties.  I spoke with Cahill's legal assistant, an investigator with the Medical examiners office, but I could never get through to Nelson.  I contacted another attorney (Mr. Ventura) who was very nice and said he would call someome in Nelso's office, who was a friend of his.  Still geting no responce, I later called Lane's attorney and Keung's attorney.

I hope this helps
D. Bill



## HENNEPIN COUNTY
## MEDICAL EXAMINER'S OFFICE
## AUTOPSY REPORT



**ME NO.:** 20-3700

**CASE TITLE:** CARDIOPULMONARY ARREST COMPLICATING LAW ENFORCEMENT SUBDUAL, RESTRAINT, AND NECK COMPRESSION

**DECEASED:** George Floyd aka Floyd Perry     **SEX:** M   **AGE:** 46

**DATE AND HOUR OF DEATH:**   5-25-20; 9:25 p.m.

**DATE AND HOUR OF AUTOPSY:** 5-26-20; 9:25 a.m.

**PATHOLOGIST:** Andrew M. Baker, M.D.

---

**FINAL DIAGNOSES:**

46-year-old man who became unresponsive while being restrained by law enforcement officers; he received emergency medical care in the field and subsequently in the Hennepin HealthCare (HHC) Emergency Department, but could not be resuscitated.

I.  Blunt force injuries

    A.  Cutaneous blunt force injuries of the forehead, face, and upper lip

    B.  Mucosal injuries of the lips

    C.  Cutaneous blunt force injuries of the shoulders, hands, elbows, and legs

    D.  Patterned contusions (in some areas abraded) of the wrists, consistent with restraints (handcuffs)

II.  Natural diseases

    A.  Arteriosclerotic heart disease, multifocal, severe

    B.  Hypertensive heart disease

        1.  Cardiomegaly (540 g) with mild biventricular dilatation

        2.  Clinical history of hypertension

    C.  Left pelvic tumor (incidental, see microscopic description)

George Floyd
20-3700
Page 2

III. No life-threatening injuries identified

    A.   No facial, oral mucosal, or conjunctival petechiae

    B.   No injuries of anterior muscles of neck or laryngeal structures

    C.   No scalp soft tissue, skull, or brain injuries

    D.   No chest wall soft tissue injuries, rib fractures (other than a single rib fracture from CPR), vertebral column injuries, or visceral injuries

    E.   Incision and subcutaneous dissection of posterior and lateral neck, shoulders, back, flanks, and buttocks negative for occult trauma

IV. Viral testing (Minnesota Department of Health, postmortem nasal swab collected 5/26/2020): positive for 2019-nCoV RNA by PCR (see 'Comments,' below)

V. Hemoglobin S quantitation (postmortem femoral blood, HHC Laboratory): 38% (see 'Comments,' below)

VI. Toxicology (see attached report for full details; testing performed on antemortem blood specimens collected 5/25/20 at 9:00 p.m. at HHC and on postmortem urine)

    A.   Blood drug and novel psychoactive substances screens:

        1.   Fentanyl 11 ng/mL

        2.   Norfentanyl 5.6 ng/mL

        3.   4-ANPP 0.65 ng/mL

        4.   Methamphetamine 19 ng/mL

        5.   11-Hydroxy Delta-9 THC 1.2 ng/mL; Delta-9 Carboxy THC 42 ng/mL; Delta-9 THC 2.9 ng/mL

        6.   Cotinine positive

        7.   Caffeine positive

    B.   Blood volatiles: negative for ethanol, methanol, isopropanol, or acetone

    C.   Urine drug screen: presumptive positive for cannabinoids, amphetamines, and fentanyl/metabolite

    D.   Urine drug screen confirmation: morphine (free) 86 ng/mL

George Floyd
20-3700
Page 3

**Comments:** The finding of sickled-appearing cells in many of the autopsy tissue sections prompted the Hemoglobin S quantitation reported above.  This quantitative result is indicative of sickle cell trait.  Red blood cells in individuals with sickle cell trait are known to sickle as a postmortem artifact.  The decedent's antemortem peripheral blood smear (made from a complete blood count collected 5/25/20 at 9:00 p.m.) was reviewed by an expert HHC hematopathologist at the Medical Examiner's request.  This review found no evidence of antemortem sickling.

The decedent was known to be positive for 2019-nCoV RNA on 4/3/2020.  Since PCR positivity for 2019-nCoV RNA can persist for weeks after the onset and resolution of clinical disease, the autopsy result most likely reflects asymptomatic but persistent PCR positivity from previous infection.

6/1/2020

X _____

Andrew M. Baker, M.D.
Chief Medical Examiner
Signed by: Andrew M. Baker MD
In accordance with HCME policy, this report was reviewed by another board-certified forensic pathologist prior to release.

George Floyd
20-3700
Page 4

**IDENTIFICATION:**

Positive identification is confirmed by comparison of antemortem and postmortem fingerprints (Federal Bureau of Investigation).

**EXTERNAL EXAMINATION:**

When initially examined, the body·is in a sealed/locked and properly labeled body bag.  Evidentiary paper bags are secured over the hands.

The body is that of a normally developed, muscular and adequately nourished appearing, 6 feet 4 inch long, 223 pound male whose appearance is consistent with the reported age of 46 years.  Unfixed lividity is present on the posterior dependent surfaces of the body, except in areas exposed to pressure. Rigor mortis is established in all of the major muscle groups, relenting with modest pressure.  The temperature is somewhat cool following refrigeration.

The scalp is covered with closely cropped black hair in a normal distribution, with some early vertex thinning.  The irides are brown, and the pupils are round and equal in diameter.  The conjunctivae are somewhat injected, but there are no bulbar or palpebral conjunctival petechiae.  There are no facial, periorbital, or oral mucosal petechiae.  The external auditory canals are free of blood.  The lobe of the left ear is remotely pierced once; the ears are otherwise unremarkable.  The nares are patent.  The nasal and facial bones are stable to palpation. A faint, 2 cm maximum dimension V-shaped scar is near the superior end of the left jawline.  The teeth appear native and in good repair.  Very short black mustache and beard stubble is in the usual distribution on the face, and a small patch of slightly longer black beard hair is just inferior to the lower lip.

The neck is straight, and the trachea is midline.  A 0.6 cm diameter circular gray-brown scar is over the middle of the left clavicle.  The chest is symmetric.  The abdomen is flat.  The external genitalia are those of a normal adult male.  The testes are descended and free of masses.  Pubic hair is present in a normal distribution.  The back, buttocks, and anus are unremarkable.

The upper and lower extremities are symmetric and free of clubbing, edema, or absence of digits.  Six faint, hypopigmented, haphazardly oriented linear scars ranging up to 1.2 cm long are scattered across the dorsum of the right

George Floyd
20-3700
Page 5

forearm.  Approximately eight gray-tan foci of healing injuries
(scars) ranging up to 0.8 cm maximum dimension are scattered
across the dorsum of the right hand.  Two similar appearing
healing injuries (scars), each 1 cm maximum dimension, are on
the anteromedial right wrist.  A similar appearing, obliquely
oriented 2 cm long linear healing injury (scar) is on the medial
right wrist.  The skin of the first dorsal webspace on the right
hand has a 4.5 cm maximum dimension area of brown
hyperpigmentation and gray-tan hyperkeratosis.  An 8 cm maximum
dimension area of brown hyperpigmentation and gray-tan
hyperkeratosis spans the first dorsal webspace on the left hand,
and has five superimposed healing linear skin cracks ranging up
to 1.2 cm long.  Similar gray-tan, scar-like areas are on the
dorsum of the left hand (over the left 2nd and 3rd
metacarpophalangeal joints and the webspaces between the
fingers) and wrist in areas ranging 0.2 to 2 cm maximum
dimension.  A 4 cm maximum dimension flat tan scar is on the
dorsum of the left hand over the 5th metacarpal.  The nails of
the hands are cut or chewed extremely short.

A 4 cm maximum dimension horizontally oriented linear brown scar
is over the anterior right hip.  A 0.5 cm maximum dimension
macular brown nevus is over the anterior right hip.  Two flat,
hyperpigmented patches, 1.2 and 2 cm maximum dimension, flank
the left side of the waistline.  A 1.5 cm maximum dimension
hypopigmented oval scar is over the right knee.  Approximately
nine haphazardly oriented linear hypopigmented scars ranging up
to 2 cm maximum dimension are scattered over and just inferior
to the right knee.  Approximately nine hyper- and hypopigmented
linear and oval scars ranging up to 2 cm maximum dimension are
over the right shin.  A faint, 1.5 cm maximum dimension hyper-
and hypopigmented scar is on the posterolateral left thigh.
Five hypopigmented linear scars ranging up to 5 cm maximum
dimension are over, just superior to, and just inferolateral to
the left knee.  A 3 cm maximum dimension area of slight skin
darkening associated with hair follicle plugging is on the
distal left calf.  The nails of the toes are somewhat elongated,
markedly thickened, and discolored yellow-brown.  The soles of
the feet and the posterior heels are somewhat hyperkeratotic and
desiccated appearing, particularly on the right.

EXH-B   6 of 13

George Floyd
20-3700
Page 6

**TATTOOS:**

- A 42 cm maximum dimension monochromatic blue tattoo of an eagle holding a rifle spans the upper chest, from shoulder to shoulder and from the inferior neck to the distal sternum.
- An 11 cm maximum dimension monochromatic blue tattoo of a pair of praying hands is on the epigastric abdomen.
- A 9 cm maximum dimension monochromatic blue tattoo of the name "LAURA" is on the right upper abdomen.
- A 10 cm maximum dimension monochromatic blue tattoo of the name "CISSY" is on the left upper abdomen.
- A 28 cm maximum dimension monochromatic blue tattoo of the name "FLOYD" spans both sides of the abdomen just superior to the umbilicus.
- A 10 cm maximum dimension monochromatic blue tattoo of what appears to be a gravestone with some letters and numbers and the letters "R.I.P." is on the anterior right forearm.
- A 12 cm maximum dimension monochromatic blue tattoo of two stars and what appears to be the name "Brittney" and the letters "R.I.P." is on the proximal anterior left forearm.
- A 20 cm maximum dimension patterned monochromatic blue tattoo spans the anterior, lateral, and posterior aspects of the left forearm.

**CLOTHING AND PERSONAL EFFECTS:**

The following clothing items are received with the body in the body bag, in a hospital patient belongings bag, and examined separate from the body at the start of the postmortem examination:

- Size XXL "Nike" brand blue track pants, extensively cut apart (presumably for medical intervention)
- A black ribbed sleeveless t-shirt (no tag), extensively cut apart (presumably for medical intervention)
- Size 3XL "Starting 5" brand black and gray sweatpants, extensively cut apart (presumably for medical intervention)
- A pair of black dress socks, one with a gray heel and gray toe box

George Floyd
20-3700
Page 7

**MEDICAL INTERVENTION:**

- Oral endotracheal tube, correctly positioned in the trachea and held in place on the face with a white and tan plastic and elastic band
- Thoracostomy incision (3.6 cm maximum dimension, somewhat ragged and V-shaped), right lateral chest (approximately six superficial punctures and cuts, ranging from pinpoint to 1.5 cm long, are adjacent to the thoracostomy)
- Thoracostomy incision (3.9 cm long, somewhat ragged and linear), left lateral chest (a pinpoint cut or puncture is just inferior to the thoracostomy)
- Curvilinear orange abrasions centered over the sternum (10 cm maximum dimension aggregate), consistent with cardiopulmonary resuscitation
- Intravascular catheter with attached segment of tubing, taped in place just proximal to the left antecubital fossa (the tape associated with this catheter has created a localized area of skin slippage in the left antecubital fossa)
- Needle puncture, just distal to the left antecubital fossa
- Intraosseous catheter with attached tubing, right tibia
- Intraosseous catheter with attached tubing, left tibia
- Intravascular catheter with attached tubing, taped in place on the right groin
- Hospital tag, right great toe
- Hospital bracelets (2), right wrist
- Needle puncture, left groin
- Minimally hemorrhagic horizontal fracture in the sternum, consistent with cardiopulmonary resuscitation
- Non-hemorrhagic fracture of the anterior left 4th rib, consistent with cardiopulmonary resuscitation

**EVIDENCE OF INJURY:**

*Head and Neck*

- 4 cm maximum dimension abraded red-black-purple contusion, lateral corner of left brow
- Pinpoint red abrasion, just left of the midline of the forehead
- 6.5 cm maximum dimension red-black abrasion, left cheek
- 0.6 cm maximum dimension red abrasion, just inferior to left corner of mouth
- 0.8 cm maximum dimension curvilinear red avulsion, just superior to right side of upper lip

006789

George Floyd
20-3700
Page 8

- Eight pinpoint to 0.2 cm maximum dimension red abrasions, right side of nose
- Faint blue contusions on the body of the nose (3.5 cm), right naris (1.5 cm), and left naris (1.0 cm)
- 1.5 cm maximum dimension aggregate of pink-purple mucosal abrasions and lacerations, upper lip
- 2 cm maximum dimension aggregate of pink-orange mucosal abrasions and lacerations, lower lip

*Shoulders and Extremities*

- 8 cm maximum dimension purple contusion with 4.5 cm maximum dimension aggregate of linear red abrasions, anterolateral right shoulder
- 2 cm maximum dimension red L-shaped scratch, superior right shoulder
- 14 cm maximum dimension pink-purple contusion with a discontinuous 8 cm maximum dimension dried red-black abrasion, left shoulder
- 0.2 cm maximum dimension red abrasion, just medial to the right elbow
- 3 cm maximum dimension faint pink contusion, just medial to the left elbow
- Pinpoint red abrasion, just medial and distal to the left elbow
- 1.5 cm maximum dimension purple contusion, proximal right shin
- 2.5 cm maximum dimension aggregate of red abrasions, distal right shin
- 0.3 cm maximum dimension red abrasion over the left calf

*Wrists and Hands*

- 1.4 cm maximum dimension red and dried black abrasion, dorsum of proximal interphalangeal joint, right index finger
- Two 0.8 cm maximum dimension red and focally dried black abrasions, dorsum of proximal interphalangeal joint, right middle finger
- Circumferential, discontinuous, 3.5 cm maximum width, roughly parallel pink-purple contusions encircling the right wrist, with areas of superimposed abrasions up to 1.2 cm maximum dimension; a 0.9 cm long superficial red scratch is on the lateral right wrist between the patterned contusion and the hand

George Floyd
20-3700
Page 9

- Circumferential, discontinuous, 2.5 cm maximum width, roughly parallel pink-purple contusions encircling the left wrist, with areas of superimposed abrasions up to 1.3 cm maximum dimension
  - On the anterolateral left wrist, in a 3.5 cm long area, the injury transitions to a dried yellow-black abraded furrow before blending into the anterior wrist crease
- 2.2 cm maximum dimension purple contusion, dorsum of left hand

**INTERNAL EXAMINATION:**

**HEAD:**  The soft tissues of the scalp are free of injury.  The calvarium is intact, as is the dura mater beneath it.  Clear cerebrospinal fluid surrounds the 1380 g brain, which has unremarkable gyri and sulci.  Coronal sections demonstrate sharp demarcation between white and gray matter, without hemorrhage or contusive injury.  The ventricles are of normal size.  The basal ganglia, brainstem, cerebellum, and arterial systems are free of injury or other abnormalities.  There are no skull fractures. The atlanto-occipital joint is stable.

**NECK:**  Layer by layer dissection of the anterior strap muscles of the neck discloses no areas of contusion or hemorrhage within the musculature.  The thyroid cartilage and hyoid bone are intact.  The larynx is lined by intact mucosa.  The thyroid is symmetric and red-brown, without cystic or nodular change.  The tongue is free of bite marks, hemorrhage, or other injuries. The cervical spinal column is palpably stable and free of hemorrhage.

**BODY CAVITIES:**  Except as previously noted, the ribs, sternum, and vertebral bodies are visibly and palpably intact.  Stripping of the parietal pleura reveals no occult rib fractures.  No excess fluid is in the pleural, pericardial, or peritoneal cavities. The organs occupy their usual anatomic positions.  Adjacent to the left external iliac vessels and left psoas muscle (but not apparently arising from them or attached to them) is a firm, 4 cm maximum dimension thinly encapsulated mass consisting of red-brown and fleshy white-gray areas, admixed with centrally scarred and calcified areas.

**RESPIRATORY SYSTEM:**  The right and left lungs weigh 1085 and 1015 g, respectively.  The external surfaces are pink only on the most anterior aspects, and deep red-purple in all other areas. The pulmonary parenchyma is diffusely congested and edematous.

George Floyd
20-3700
Page 10

No mass lesions or areas of consolidation are present.  The
pulmonary vascular tree is free of thromboemboli.  The
tracheobronchial tree is free of blood, edema fluid, or foreign
material.

**CARDIOVASCULAR SYSTEM:**  The 540 g heart (upper limit of normal for
body length is 510 g; upper limit of normal for body weight is
521 g)[1] is contained in an intact pericardial sac.  The
epicardial surface is smooth, with modest fat investment.  The
coronary arteries are present in a normal distribution, with a
right dominant pattern.  Cross sections of the vessels show
multifocal atherosclerosis, with 75% proximal and 75% mid
narrowing of the left anterior descending coronary artery; 75%
proximal narrowing of the 1st diagonal branch of the left
anterior descending coronary artery; 25% proximal narrowing of
the circumflex coronary artery; and 90% proximal narrowing of
the right coronary artery.  The myocardium is homogeneous, red-
brown, and firm.  The valve leaflets are thin and mobile.  The
walls of the left and right ventricles are 1.2 and 0.4 cm thick,
respectively.  The endocardium is smooth and glistening.  Both
ventricular cavities are mildly dilated.  The minimally
atherosclerotic aorta gives rise to three intact and patent arch
vessels.  The renal and mesenteric vessels are unremarkable.

**LIVER AND BILIARY SYSTEM:**  The 2565 g liver has an intact, smooth
capsule and a sharp anterior border.  The parenchyma is tan-
brown and congested, with the usual lobular architecture.  No
mass lesions or other abnormalities are seen.  The gallbladder
contains a moderate amount of green-black bile and no stones.
The mucosal surface is green and velvety.  The extrahepatic
biliary tree is patent.

**SPLEEN:**  The 140 g spleen has a smooth, intact, red-purple
capsule.  The parenchyma is maroon and congested.

**PANCREAS:**  The pancreas is firm and yellow-tan, with the usual
lobular architecture.  No mass lesions or other abnormalities
are seen.

**ADRENALS:**  The right and left adrenal glands are symmetric, with
bright yellow cortices and gray medullae.  No masses or areas of
hemorrhage are identified.

---

[1] Kitzman DW, Scholz DG, Hagen PT, et al. Age-related changes in normal human
hearts during the first 10 decades of life. Part II (maturity): a
quantitative anatomic study of 765 specimens from subjects 20 to 99 years
old. Mayo Clin Proc. 1988; 63: 137-146.

George Floyd
20-3700
Page 11

**GENITOURINARY SYSTEM:**  The right and left kidneys weigh 205 and 225 g, respectively.  The external surfaces are intact and smooth.  The cut surfaces are red-tan and congested, with uniformly thick cortices and sharp corticomedullary junctions. The pelves are unremarkable and the ureters are normal in course and caliber.  White bladder mucosa overlies an intact bladder wall.  The bladder contains approximately 80 mL of yellow urine. The prostate is normal in size, with lobular, yellow-tan parenchyma.  The seminal vesicles are unremarkable.  The testes are free of mass lesions, contusions, or other abnormalities.

**GASTROINTESTINAL TRACT:**  The esophagus is intact and lined by smooth, gray-white mucosa.  The stomach contains approximately 450 mL of dark brown fluid with innumerable soft fragments of gray-white food particulate matter resembling bread.  The gastric wall is intact.  The duodenum, loops of small bowel, and colon are unremarkable.  The appendix is present.

**SPECIAL PROCEDURES:**

Incision and subcutaneous dissection of the anterior and lateral aspects of the wrists demonstrates no foci of contusion or hemorrhage deep to the skin on the right.  In the left wrist, there is multifocal fascial hemorrhage, with approximately 3 mL liquid blood accumulation, in the tissue surrounding the flexor tendons.  The exposed wrist musculature itself appears free of injury.

An incision from the back of the head to the lower back, extending onto both buttocks, is dissected subcutaneously to the lateral aspects of the neck, the shoulders, and flanks.  No areas of subcutaneous hemorrhage, soft tissue contusion, or other occult injury are found in the posterior neck, right and left lateral neck, shoulders, back, flanks, or buttocks.

**ADDITIONAL PROCEDURES:**

- Documentary photographs are taken.
- Postmortem specimens collected and retained: vitreous fluid, femoral blood, urine, liver, and gastric contents.
- Representative tissue biopsies are retained in formalin for microscopic examination.
- The dissected organs are returned to the body.
- Pulled head hairs are placed in a labeled, sealed envelope.

AB/SB: 5/27/20

George Floyd
20-3700
Page 12

**MICROSCOPIC EXAMINATION:**

**HEART (3-5):**  Cross sections of left ventricular, right ventricular, and interventricular septal myocardium are examined and show the expected microscopic architecture, with readily visible boxcar nuclear changes in the septal and left ventricular sections.  Cross sections of coronary arteries, though not all ideally oriented, confirm the gross impression of atherosclerotic narrowing.

**LUNGS (6):**  Sections of right and left lung show generally normal overall architecture, without malignancy, pneumonia, granulomatous inflammation, or polarizable intravascular foreign material.  Many small vessels contain rounded clear vacuoles, consistent with bone marrow embolism from cardiopulmonary resuscitation.

**LIVER (7):**  No significant pathologic abnormality (marked congestion).

**SPLEEN (7):**  No significant pathologic abnormality.

**KIDNEY (8):**  No significant pathologic abnormality (marked congestion).

**PANCREAS (8):**  No significant pathologic abnormality.

**ADRENAL (9):**  No significant pathologic abnormality (marked congestion).

**SPLEEN (9):**  No significant pathologic abnormality (marked congestion).

**BRAIN (10-12):**  Sections of hippocampus, cerebellum, cerebral cortex, and midbrain show the expected microscopic architecture, without hypoxic-ischemic, reactive, neoplastic, or inflammatory changes.

**LEFT PELVIC MASS (1,2):**  Decalcified (1) and routinely fixed (2) sections show a proliferation of generally bland appearing cells with small to moderate amounts of eosinophilic cytoplasm and generally uniform nuclei with neuroendocrine features.  Occasional

EXH-B 13 of 13

George Floyd
20-3700
Page 13

nuclei show mild pleomorphism, but mitotic activity is not seen.  Much of the tumor is composed of cells in sheets, cords, and nests in a carcinoid-like pattern; other areas vary from vascular to sclerosed and fibrotic.  Taken together, the gross and microscopic (H&E-stains) features of the lesion are most suggestive of an extraadrenal paraganglioma.  AFB and GMS stains are non-contributory.

**NOTE:**          *Many of the above tissue sections, particularly those noted to have congestion, contain sickled-appearing red blood cells.*



**NMS Labs**
200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**  05/31/2020 18:44

To:   148889
Hennepin County Medical Examiner
530 Chicago Avenue

Minneapolis, MN   55415

| | |
|---|---|
| **Patient Name** | FLOYD, GEORGE |
| **Patient ID** | 2020-3700 |
| **Chain** | NMSCP59310 |
| **Age** 46 Y | **DOB** 10/14/1973 |
| **Gender** | Male |
| **Workorder** | 20159963 |

**Page 1 of 7**

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Caffeine | Positive | mcg/mL | 001 - Hospital Blood |
| Cotinine | Positive | ng/mL | 001 - Hospital Blood |
| 4-ANPP | 0.65 | ng/mL | 003 - Hospital Blood |
| 11-Hydroxy Delta-9 THC | 1.2 | ng/mL | 001 - Hospital Blood |
| Delta-9 Carboxy THC | 42 | ng/mL | 001 - Hospital Blood |
| Delta-9 THC | 2.9 | ng/mL | 001 - Hospital Blood |
| Methamphetamine | 19 | ng/mL | 001 - Hospital Blood |
| Fentanyl | 11 | ng/mL | 001 - Hospital Blood |
| Norfentanyl | 5.6 | ng/mL | 001 - Hospital Blood |
| Cannabinoids | Presump Pos | ng/mL | 012 - Urine |
| Amphetamines | Presump Pos | ng/mL | 012 - Urine |
| Fentanyl / Metabolite | Presump Pos | ng/mL | 012 - Urine |
| Morphine - Free | 86 | ng/mL | 012 - Urine |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 8050U | Postmortem, Urine Screen Add-on (6-MAM Quantification only) |
| 9096B | Alcohol Screen, Blood (Forensic) |
| 8210B | Novel Psychoactive Substances (NPS) Screen 2, Blood |
| 8052B | Postmortem, Expanded, Blood (Forensic) |
| 8756B | Novel Psychoactive Substances (NPS) Screen 1, Blood |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Lavender Vial | 2.8 mL | 05/25/2020 21:00 | Hospital Blood | |
| 002 | Gray Vial | 0.6 mL | 05/25/2020 21:00 | Hospital Blood | |
| 003 | Lavender Vial | 5.75 mL | 05/25/2020 21:00 | Hospital Blood | |
| 004 | Light Blue Vial | 2.5 mL | 05/25/2020 21:00 | Hospital Blood | |
| 005 | Green Vial | 1.3 mL | 05/25/2020 21:00 | Hospital Blood | |
| 006 | Red Vial | 0.75 mL | 05/25/2020 21:00 | Hospital Serum or Plasma | |
| 007 | Gray Top Tube | 8.8 mL | 05/26/2020 12:20 | Femoral Blood | |
| 008 | Gray Top Tube | 8.8 mL | 05/26/2020 12:20 | Femoral Blood | |
| 009 | Gray Top Tube | 8.8 mL | 05/26/2020 12:20 | Femoral Blood | |



CONFIDENTIAL

**Workorder** 20159963
**Chain** NMSCP59310
**Patient ID** 2020-3700

Page 2 of 7

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 010 | Gray Top Tube | 8.8 mL | 05/26/2020 12:20 | Femoral Blood | |
| 011 | Gray Vial | 3.3 mL | 05/26/2020 12:20 | Femoral Blood | |
| 012 | Yellow Vial | 7.75 mL | 05/26/2020 12:20 | Urine | |
| 013 | Yellow Vial | 7.75 mL | 05/26/2020 12:20 | Urine | |

All sample volumes/weights are approximations.

Specimens received on 05/28/2020.

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Caffeine | Positive | mcg/mL | 0.20 | 001 - Hospital Blood | LC/TOF-MS |
| Cotinine | Positive | ng/mL | 200 | 001 - Hospital Blood | LC/TOF-MS |
| 4-ANPP | 0.65 | ng/mL | 0.10 | 003 - Hospital Blood | LC-MS/MS |
| 11-Hydroxy Delta-9 THC | 1.2 | ng/mL | 1.0 | 001 - Hospital Blood | LC-MS/MS |
| Delta-9 Carboxy THC | 42 | ng/mL | 5.0 | 001 - Hospital Blood | LC-MS/MS |
| Delta-9 THC | 2.9 | ng/mL | 0.50 | 001 - Hospital Blood | LC-MS/MS |
| Methamphetamine | 19 | ng/mL | 5.0 | 001 - Hospital Blood | LC-MS/MS |
| Fentanyl | 11 | ng/mL | 0.10 | 001 - Hospital Blood | LC-MS/MS |
| Norfentanyl | 5.6 | ng/mL | 0.20 | 001 - Hospital Blood | LC-MS/MS |
| Cannabinoids | Presump Pos | ng/mL | 50 | 012 - Urine | EIA |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |
| Amphetamines | Presump Pos | ng/mL | 500 | 012 - Urine | EIA |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |
| Fentanyl / Metabolite | Presump Pos | ng/mL | 2.0 | 012 - Urine | EIA |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |
| Morphine - Free | 86 | ng/mL | 25 | 012 - Urine | LC-MS/MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

**Reference Comments:**

1.  11-Hydroxy Delta-9 THC (Active Metabolite) - Hospital Blood:

    11-Hydroxy Delta-9 THC is an active intermediate metabolite of tetrahydrocannabinol (THC) the active component of marijuana. Usual peak levels: Less than 10% of THC levels after smoking.

2.  4-ANPP (Despropionyl fentanyl) - Hospital Blood:

    4-ANPP (despropionylfentanyl) is a precursor chemical used in the production of fentanyl and is also a fentanyl metabolite.  It may be used in the production of other related compounds such as acetyl fentanyl, butyryl fentanyl and furanyl fentanyl and may be a metabolite of these  and other fentanyl-related compounds.  It is considered to be pharmacologically weak.

3.  Amphetamines - Urine:

    Amphetamines are a class of central nervous system stimulant drugs, with some therapeutic uses, and a high potential for abuse.

    This result derives from a presumptive test, which may be subject to cross-reactivity with non-amphetamine related compounds.  A second test is necessary to confirm the presence of amphetamine related compounds.

EXH-C 3of9



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 20159963 |
| **Chain** | NMSCP59310 |
| **Patient ID** | 2020-3700 |

Page 3 of 7

## Reference Comments:

4.   Caffeine (No-Doz®) - Hospital Blood:

Caffeine is a xanthine-derived central nervous system stimulant. It also produces diuresis and cardiac and respiratory stimulation. It can be readily found in such items as coffee, tea, soft drinks and chocolate. As a reference, a typical cup of coffee or tea contains between 40 to 100 mg caffeine.

The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory.

5.   Cannabinoids - Urine:

Cannabinoids are chemical compounds derived from the plant Cannabis sativa (marijuana), including active components, chemical congeners and metabolites. Delta-9-Tetrahydrocannabinol (THC) is the principal active component.

This result derives from a presumptive test, which may be subject to cross-reactivity with non-cannabinoid related compounds. A second test is necessary to confirm the presence of cannabinoid related compounds.

6.   Cotinine (Nicotine Metabolite) - Hospital Blood:

Cotinine is a metabolite of nicotine and may be encountered in the fluids and tissues of an individual as a result of tobacco exposure.

Anabasine is a natural product occurring in tobacco, but not in pharmaceutical nicotine and a separate test for anabasine in urine can be used to distinguish tobacco from pharmaceutical nicotine use.

The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory.

7.   Delta-9 Carboxy THC (Inactive Metabolite) - Hospital Blood:

Delta-9-THC is the principle psychoactive ingredient of marijuana/hashish. Delta-9-carboxy-THC (THCC) is the inactive metabolite of THC. The usual peak concentrations in serum for 1.75% or 3.55% THC marijuana cigarettes are 10 - 101 ng/mL attained 32 to 240 minutes after beginning smoking, with a slow decline thereafter. The ratio of whole blood concentration to plasma concentration is unknown for this analyte. THCC may be detected for up to one day or more in blood. Both delta-9-THC and THCC may be present substantially longer in chronic users. THCC is usually not detectable after passive inhalation.

8.   Delta-9 THC (Active Ingredient of Marijuana) - Hospital Blood:

Marijuana is a DEA Schedule I hallucinogen. Pharmacologically, it has depressant and reality distorting effects. Collectively, the chemical compounds that comprise marijuana are known as Cannabinoids.

Delta-9-THC is the principle psychoactive ingredient of marijuana/hashish. It rapidly leaves the blood, even during smoking, falling to below detectable levels within several hours. Delta-9-carboxy-THC (THCC) is the inactive metabolite of THC and may be detected for up to one day or more in blood. Both delta-9-THC and THCC may be present substantially longer in chronic users.
THC concentrations in blood are usually about one-half of serum/plasma concentrations. Usual peak levels in serum for 1.75% or 3.55% THC marijuana cigarettes: 50 - 270 ng/mL at 6 to 9 minutes after beginning smoking, decreasing to less than 5 ng/mL by 2 hrs.

9.   Fentanyl (Duragesic®; Sublimaze®) - Hospital Blood:

Fentanyl is a DEA Schedule II synthetic morphine substitute anesthetic/analgesic. It is reported to be 80 to 200 times as potent as morphine and has a rapid onset of action as well as addictive properties.

It is reported that patients lost consciousness at mean plasma levels of fentanyl of 34 ng/mL when infused with 75 mcg/Kg over a 15 min period; peak plasma levels averaged 50 ng/mL.

After application of a fentanyl transdermal preparation (patch), serum fentanyl concentrations are reported to be in the following ranges within 24 hours:
25 mcg/hour patch: 0.3 - 1.2 ng/mL
50 mcg/hour patch: 0.6 - 1.8 ng/mL
75 mcg/hour patch: 1.1 - 2.6 ng/mL
100 mcg/hour patch: 1.9 - 3.8 ng/mL



CONFIDENTIAL

**Workorder** 20159963
**Chain** NMSCP59310
**Patient ID** 2020-3700

Page 4 of 7

## Reference Comments:

Following removal of the patch, serum fentanyl concentrations are reported to decrease with a mean elimination half-life of 17 hours (range, 13 to 22 hours).

The mean peak plasma serum fentanyl concentration in adults given an 800 mcg oral transmucosal fentanyl preparation over 15 minutes is reported at 2.1 ng/mL (range, 1.4 - 3.0 ng/mL) at approximately 0.4 hours.

Signs associated with fentanyl toxicity include severe respiratory depression, seizures, hypotension, coma and death. In fatalities from fentanyl, blood concentrations are variable and have been reported as low as 3 ng/mL.

Substance(s) known to interfere with the identity and/or quantity of the reported result: 4-methylphenethyl acetyl fentanyl

10.   Fentanyl / Metabolite - Urine:

Fentanyl is a DEA Schedule II synthetic morphine substitute anesthetic/analgesic. It is reported to be 80 to 200 times as potent as morphine and has a rapid onset of action as well as addictive properties.

This result derives from a presumptive test, which may be subject to cross-reactivity with non-fentanyl related compounds. A second test is necessary to confirm the presence of fentanyl related compounds.

11.   Methamphetamine - Hospital Blood:

d-Methamphetamine is a DEA schedule II stimulant drug capable of causing hallucinations, aggressive behavior and irrational reactions. Chemically, there are two forms (isomers) of methamphetamine: l- and d-methamphetamine. The l-isomer is used in non-prescription inhalers as a decongestant and has weak CNS-stimulatory activity. The d-isomer has been used therapeutically as an anorexigenic agent in the treatment of obesity and has potent CNS-, cardiac- and circulatory-stimulatory activity. Amphetamine and norephedrine (phenylpropanolamine) are metabolites of methamphetamine. d-Methamphetamine is an abused substance because of its stimulatory effects and is also addictive.

A peak blood concentration of methamphetamine of 20 ng/mL was reported at 2.5 hr after an oral dosage of 12.5 mg. Blood levels of 200 - 600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior. High doses of methamphetamine can also elicit restlessness, confusion, hallucinations, circulatory collapse and convulsions.

*In this case, the level of methamphetamine determined has not been differentiated according to its isomeric forms. Differentiation of the isomers of methamphetamine is available upon request.

12.   Morphine - Free (Codeine Metabolite) - Urine:

Morphine is a DEA Schedule II narcotic analgesic. In analgesic therapy, it is usually encountered as the parent compound, however, it is also commonly found as the metabolite of codeine and heroin. In illicit preparations from which morphine may arise, codeine may be present as a contaminant. A large portion of the morphine is bound to the blood proteins or is conjugated; that which is not bound or conjugated is termed 'free morphine'. Hydromorphone is a reported metabolite of morphine.

In general, free morphine is the active biologic agent. Morphine has diverse effects that may include analgesia, drowsiness, nausea and respiratory depression. 6-monoacetylmorphine (6-MAM) is the 6-monoacetylated form of morphine, which is pharmacologically active. It is commonly found as the result of heroin use.

13.   Norfentanyl (Fentanyl Metabolite) - Hospital Blood:

Norfentanyl is the primary inactive metabolite of the synthetic narcotic analgesic fentanyl.
Substance(s) known to interfere with the identity and/or quantity of the reported result: Benzyl Fentanyl

## Sample Comments:

001       Physician/Pathologist Name: Dr. Andrew Baker

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 20159963 |
| **Chain** | NMSCP59310 |
| **Patient ID** | 2020-3700 |

**Page 5 of 7**

Workorder 20159963 was electronically signed on 05/31/2020 18:27 by:

Daniel S. Isenschmid, Ph.D., F-ABFT
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case.  For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive.  If the compound is listed as None Detected, it is not present above the Reporting Limit.   Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 50016U - Opiates - Free (Unconjugated) Confirmation, Urine

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 6-Monoacetylmorphine - Free | 5.0 ng/mL | Hydromorphone - Free | 5.0 ng/mL |
| Codeine - Free | 25 ng/mL | Morphine - Free | 25 ng/mL |
| Dihydrocodeine / Hydrocodol - Free | 25 ng/mL | Oxycodone - Free | 25 ng/mL |
| Hydrocodone - Free | 25 ng/mL | Oxymorphone - Free | 5.0 ng/mL |

Acode 52198B - Cannabinoids Confirmation, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 11-Hydroxy Delta-9 THC | 1.0 ng/mL | Delta-9 THC | 0.50 ng/mL |
| Delta-9 Carboxy THC | 5.0 ng/mL | | |

Acode 52483B - Amphetamines Confirmation, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamine | 5.0 ng/mL | Methamphetamine | 5.0 ng/mL |
| Ephedrine | 5.0 ng/mL | Norpseudoephedrine | 5.0 ng/mL |
| MDA | 5.0 ng/mL | Phentermine | 5.0 ng/mL |
| MDEA | 5.0 ng/mL | Phenylpropanolamine | 20 ng/mL |
| MDMA | 5.0 ng/mL | Pseudoephedrine | 5.0 ng/mL |

Acode 52484B - Fentanyl and Acetyl Fentanyl Confirmation, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetyl Fentanyl | 0.10 ng/mL | Norfentanyl | 0.20 ng/mL |
| Fentanyl | 0.10 ng/mL | | |

Acode 52488B - Designer Opioids Confirmation (2019 Scope), Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 2-Furanylfentanyl | 0.050 ng/mL | Butyrylfentanyl | 0.050 ng/mL |
| 4-ANPP | 0.10 ng/mL | Carfentanil | 0.050 ng/mL |
| Acryl Fentanyl | 0.050 ng/mL | Cyclopropylfentanyl | 0.050 ng/mL |

Ex A-C 6 of 9



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 20159963 |
| **Chain** | NMSCP59310 |
| **Patient ID** | 2020-3700 |

**Page 6 of 7**

## Analysis Summary and Reporting Limits:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Isobutyrylfentanyl | 0.050 ng/mL | meta-Methylmethoxyacetylfentanyl | 0.050 ng/mL |
| Methoxyacetylfentanyl | 0.050 ng/mL | ortho-Fluorofentanyl | 0.050 ng/mL |
| THF-F | 0.050 ng/mL | para-Fluorobutyrylfentanyl | 0.050 ng/mL |
| U-47700 | 0.050 ng/mL | para-Fluorofentanyl | 0.050 ng/mL |
| U-49900 | 0.050 ng/mL | para-Fluoroisobutyrylfentanyl | 0.050 ng/mL |
| U-51754 | 0.050 ng/mL | para-Methylmethoxyacetylfentanyl | 0.050 ng/mL |
| Valeryl Fentanyl | 0.050 ng/mL | trans-3-Methylfentanyl | 0.050 ng/mL |
| cis-3-Methylfentanyl | 0.050 ng/mL | | |

Acode 8050U - Postmortem, Urine Screen Add-on (6-MAM Quantification only)

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 500 ng/mL | Fentanyl / Metabolite | 2.0 ng/mL |
| Barbiturates | 0.30 mcg/mL | Methadone / Metabolite | 300 ng/mL |
| Benzodiazepines | 50 ng/mL | Opiates | 300 ng/mL |
| Cannabinoids | 50 ng/mL | Oxycodone / Oxymorphone | 100 ng/mL |
| Cocaine / Metabolites | 150 ng/mL | Phencyclidine | 25 ng/mL |

Acode 8052B - Postmortem, Expanded, Blood (Forensic) - Hospital Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Gabapentin | 5.0 mcg/mL |
| Cannabinoids | 10 ng/mL | Salicylates | 120 mcg/mL |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of compound classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified compound class are included. Some specific analytes outside these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs.
Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

Acode 8210B - Novel Psychoactive Substances (NPS) Screen 2, Blood - Hospital Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for: The following is a general list of compound classes considered to be Novel Psychoactive Substances included in the Gas Chromatographic screen. The detection of any particular compound is concentration-dependent. Please note that not all known compounds included in each specified class or heading are included. Some specific compounds outside these classes are also included. For a detailed list of all compounds and reporting limits included in this screen, please contact NMS Labs.
Substituted Phenethylamines, Opioid Analgesics, Substituted Cathinones, Pyrrolidinophenones, Piperazines, Tryptamines, Aminoindanes, and Benzofurans.

Acode 8756B - Novel Psychoactive Substances (NPS) Screen 1, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 2-Furanylfentanyl | 0.10 ng/mL | 25B-NBOMe | 1.0 ng/mL |



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 20159963 |
| **Chain** | NMSCP59310 |
| **Patient ID** | 2020-3700 |

Page 7 of 7

**Analysis Summary and Reporting Limits:**

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 25C-NBOMe | 1.0 ng/mL | Meclonazepam | 5.0 ng/mL |
| 25H-NBOMe | 1.0 ng/mL | Mephedrone | 10 ng/mL |
| 25I-NBOMe | 1.0 ng/mL | Methoxetamine | 2.0 ng/mL |
| 3-Fluorophenmetrazine | 5.0 ng/mL | Methoxphenidine | 5.0 ng/mL |
| 3-MeO-PCP | 5.0 ng/mL | Methoxyacetylfentanyl | 0.50 ng/mL |
| 4-ANPP | 0.10 ng/mL | Methylone | 10 ng/mL |
| 4-MeO-PCP | 5.0 ng/mL | Mitragynine | 10 ng/mL |
| Acetyl Fentanyl | 0.50 ng/mL | N-Ethyl Pentylone | 10 ng/mL |
| Acryl Fentanyl | 0.10 ng/mL | Pentedrone | 2.0 ng/mL |
| BZP | 10 ng/mL | Pentylone | 10 ng/mL |
| Bromazepam | 10 ng/mL | Phenazepam | 10 ng/mL |
| Butylone | 10 ng/mL | Pyrazolam | 5.0 ng/mL |
| Butyrylfentanyl | 0.10 ng/mL | TFMPP | 10 ng/mL |
| Carfentanil | 0.10 ng/mL | THF-F | 0.20 ng/mL |
| Clephedrone | 50 ng/mL | U-47700 | 1.0 ng/mL |
| Clonazolam | 5.0 ng/mL | U-49900 | 1.0 ng/mL |
| Cyclopropylfentanyl | 0.50 ng/mL | U-51754 | 1.0 ng/mL |
| Delorazepam | 5.0 ng/mL | Valeryl Fentanyl | 0.50 ng/mL |
| Deschloroetizolam | 2.0 ng/mL | alpha-PVP | 2.0 ng/mL |
| Dibutylone | 10 ng/mL | cis-3-Methylfentanyl | 0.10 ng/mL |
| Diclazepam | 20 ng/mL | meta-Methylmethoxyacetylfentanyl | 0.50 ng/mL |
| Ethylone | 10 ng/mL | ortho-Fluorofentanyl | 0.10 ng/mL |
| Etizolam | 10 ng/mL | para-Fluorobutyrylfentanyl | 0.10 ng/mL |
| Flubromazepam | 20 ng/mL | para-Fluorofentanyl | 0.10 ng/mL |
| Flubromazolam | 5.0 ng/mL | para-Fluoroisobutyrylfentanyl | 0.10 ng/mL |
| Isobutyrylfentanyl | 0.10 ng/mL | para-Methylmethoxyacetylfentanyl | 0.50 ng/mL |
| MDPV | 10 ng/mL | trans-3-Methylfentanyl | 0.10 ng/mL |
| MPHP | 10 ng/mL | | |

Acode 9096B - Alcohol Screen, Blood (Forensic) - Hospital Blood

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

EX11-C  8 of 9



ANALYSIS REQUISITION AND CHAIN OF CUSTODY

200 Welsh Road. * Horsham, PA 19044-2208
(215) 657-4900 * (866) 522-2216 * Fax (215) 366-1501
www.nmslabs.com

| NMS USE ONLY |
| DO NOT WRITE IN THIS SPACE |

## ACCESSION NMSCP59310

NMSCP59310

| | | |
|---|---|---|
| **CLIENT ACCOUNT** | 148889 - Hennepin County Medical Examiner,Minneapolis | |
| **CASE ID** | 2020-3700 | |

| **DECEDENT NAME** | FLOYD, GEORGE | **DOB** | 10/14/1973 | **GENDER** | M |
|---|---|---|---|---|---|

### REQUISITION QUESTIONS

| MANNER OF DEATH | UNDETERMINED |
|---|---|
| SPECIMEN CONDITION | ANTEMORTEM |
| SPECIAL INSTRUCTIONS | Please prioritize hospital blood for all testing and use postmortem blood when admission blood is insufficent |

### TEST(S)

| 8052B | Postmortem, Expanded, Blood (Forensic) | Blood \| Hospital \| 05/25/2020 21:00 |
|---|---|---|
| 8756B | Novel Psychoactive Substances (NPS) Screen 1, Blood | Blood \| Hospital \| 05/25/2020 21:00 |
| 8210B | Novel Psychoactive Substances (NPS) Screen 2, Blood | Blood \| Hospital \| 05/25/2020 21:00 |
| 8050U | Postmortem, Urine Screen Add-on (6-MAM Quantification only) | Any Sample |

### SAMPLE(S)

| COLLECTED | MATRIX | SOURCE |
|---|---|---|
| 05/26/2020 12:20 | Blood | Femoral |
| 05/26/2020 12:20 | Blood | Femoral |
| 05/26/2020 12:20 | Blood | Femoral |
| 05/26/2020 12:20 | Blood | Femoral |
| 05/26/2020 12:20 | Blood | Femoral |
| 05/25/2020 21:00 | Blood | Hospital |
| 05/25/2020 21:00 | Blood | Hospital |
| 05/25/2020 21:00 | Blood | Hospital |
| 05/25/2020 21:00 | Blood | Hospital |
| 05/25/2020 21:00 | Blood | Hospital |
| 05/25/2020 21:00 | Blood | Hospital |
| 05/26/2020 12:20 | Urine | N/A |
| 05/26/2020 12:20 | Urine | N/A |

### REQUISITION QUESTIONS (REPORTABLE)

| PHYSICIAN/PATHOLOGIST NAME | Dr. Andrew Baker |
|---|---|

| DATE | RELINQUISHED BY | RECEIVED BY | PURPOSE OF TRANSFER |
|------|-----------------|-------------|---------------------|
|      |                 |             |                     |
|      |                 |             |                     |
|      |                 |             |                     |
|      |                 |             |                     |

| ORDERED BY | Hunter Kane | REQUISITION TYPE | POSTMORTEM |
|------------|-------------|------------------|------------|

**028341**

200 Welsh Road. * Horsham, PA 19044-2208 * (215) 657-4900 * (866) 522-2216 * Fax (215) 366-1501 * www.nmslabs.com * © 2020 NMS Labs. All Rights Reserved.

The Wayback Machine - https://web.archive.org/web/20200523163601/http://www.ci.minneapolis.mn.us/police/pol...
Minneapolismn.gov

# 5-300 Use of Force

### 5-301 PURPOSE (10/16/02) (08/17/07) (07/28/16)

**A.** Sanctity of life and the protection of the public shall be the cornerstones of the MPD's use of force policy.

**B.** The purpose of this chapter is to provide all sworn MPD employees with clear and consistent policies and procedures regarding the use of force while engaged in the discharge of their official duties. (**Note**: MPD Training Unit Lesson Plans – Use of Force, are used as a reference throughout this chapter.)

### 5-301.01 POLICY (10/16/02) (08/17/07)

Based on the Fourth Amendment's "reasonableness" standard, sworn MPD employees shall only use the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used. The force used shall be consistent with current MPD training.

### 5-301.02 STATE REQUIREMENTS (10/11/02)

The MPD shall comply with Minn. Stat. §626.8452 to establish and enforce a written policy governing the use of force, including deadly force and state-mandated pre-service and in-service training in the use of force for all sworn MPD employees.(08/17/07)

### 5-302 USE OF FORCE DEFINITIONS (10/16/02) (10/01/10)

**Active Aggression:** Behavior initiated by a subject that may or may not be in response to police efforts to bring the person into custody or control. A subject engages in active aggression when presenting behaviors that constitute an assault or the circumstances reasonably indicate that an assault or injury to any person is likely to occur at any moment. (10/01/10) (04/16/12)

**Active Resistance:** A response to police efforts to bring a person into custody or control for detainment or arrest. A subject engages in active resistance when engaging in physical actions (or verbal behavior reflecting an intention) to make it more difficult for officers to achieve actual physical control. (10/01/10) (04/16/12)

**Deadly Force:** Minn. Stat. §609.066 states that: "Force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing death or great bodily harm. The intentional discharge of a firearm other than a firearm loaded with less-lethal munitions and used by a peace officer within the scope of official duties, in the direction of another person, or at a vehicle in which another person is believed to be, constitutes deadly force." (10/01/10)

**Flight:** Is an effort by the subject to avoid arrest or capture by fleeing without the aid of a motor vehicle. (10/01/10)

**Great Bodily Harm:** Bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ, or other serious bodily harm.

**Non-Deadly Force:** Force that does not have the reasonable likelihood of causing or creating a substantial risk of death or great bodily harm. This includes, but is not limited to, physically subduing, controlling, capturing, restraining or physically managing any person. It also includes the actual use of any less-lethal and non-lethal weapons. (08/17/07)

**Objectively Reasonable Force:** The amount and type of force that would be considered rational and logical to an "objective" officer on the scene, supported by facts and circumstances known to an officer at the time force was used. (08/17/07)

**Passive Resistance:** A response to police efforts to bring a subject into custody or control for detainment or arrest.

**5-304**      **THREATENING THE USE OF FORCE AND DE-ESCALATION (10/16/02) (06/01/12)**
              **(07/28/16)**

(A-D)

### A. Threatening the Use of Force

As an alternative and/or the precursor to the actual use of force, MPD officers shall consider verbally announcing their intent to use force, including displaying an authorized weapon as a threat of force, when reasonable under the circumstances. The threatened use of force shall only occur in situations that an officer reasonably believes may result in the authorized use of force. This policy shall not be construed to authorize unnecessarily harsh language. (08/17/07) (07/28/16)

### B. De-escalation

Whenever reasonable according to MPD policies and training, officers shall use de-escalation tactics to gain voluntary compliance and seek to avoid or minimize use of physical force. (06/01/12) (07/28/16)

1. When safe and feasible, officers shall:

   a. Attempt to slow down or stabilize the situation so that more time, options and resources are available.

      i. Mitigating the immediacy of threat gives officers more time to call additional officers or specialty units and to use other resources.

      ii. The number of officers on scene may make more force options available and may help reduce overall force used.

   b. Consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to:

      · Medical conditions
      · Mental impairment
      · Developmental disability
      · Physical limitation
      · Language barrier
      · Influence of drug or alcohol use
      · Behavioral crisis

   Such consideration, when time and circumstances reasonably permit, shall then be balanced against incident facts when deciding which tactical options are the most appropriate to resolve the situation safely.

2. De-escalation tactics include, but are not limited to:

   · Placing barriers between an uncooperative subject and an officer.
   · Containing a threat.
   · Moving from a position that exposes officers to potential threats to a safer position.
   · Reducing exposure to a potential threat using distance, cover or concealment.
   · Communication from a safe position intended to gain the subject's compliance, using verbal persuasion, advisements or warnings.

1. Officers shall use reasonableness, sound tactics and available options during encounters to maximize the likelihood that they can safely resolve the situation.

2. A lack of reasonable or sound tactics can limit options available to officers, and unnecessarily place officers and the public at risk.

## 5-306 USE OF FORCE – REPORTING AND POST INCIDENT REQUIREMENTS (08/17/07)

Any sworn MPD employee who uses force shall comply with the following requirements:

**Medical Assistance:**  As soon as reasonably practical, determine if anyone was injured and render medical aid consistent with training and request Emergency Medical Service (EMS) if necessary.

### Supervisor Notification and CAPRS Reporting Requirements

#### No CAPRS Report Required

Unless an injury or alleged injury has occurred, the below listed force does not require a CAPRS report or supervisor notification.

- Escort Holds
- Joint Manipulations
- Nerve Pressure Points (Touch Pressure)
- Handcuffing
- Gun drawing or pointing

#### CAPRS Report Required – No Supervisor Notification required

The following listed force requires a CAPRS report, but does not require supervisor notification.

- Takedown Techniques
- Chemical Agent Exposures

#### CAPRS Report Required - Supervisor Notification Required

All other force, injuries or alleged injury incidents require both a CAPRS report and supervisor notification. The sworn employee shall remain on scene and immediately notify a supervisor by phone or radio of the force that was used.

Supervisors shall not conduct a force review on their own use of force.  Any other supervisor of any rank shall conduct the force review. (04/16/12)

A CAPRS report entitled "FORCE" shall be completed as soon as practical, but no later than the end of that shift. A supplement describing the use of force incident in detail shall be completed and entered directly into the CAPRS reporting system (no handwritten force reports). Employees shall ensure that all applicable force portions of the CAPRS report are completed in full.

Sworn employees shall complete a CAPRS report entitled "PRIORI" for all incidents in which

g.  Locate and identify witnesses to the use of force incident. (12/15/09)

h.  Obtain statements from witnesses to the use of force incident.

i.  Contact the Internal Affairs Unit Commander immediately by phone if the force used appears to be unreasonable or appears to constitute possible misconduct. (04/16/12)

4.  Complete and submit the Supervisor Use of Force Review and Summary in CAPRS as soon as practical, but prior to the end of that shift.

   a.  Ensure that all actions taken in the preliminary investigation process and the information obtained from these actions are included in the Summary and that all other relevant information is entered in the appropriate sections of the report. (12/15/09)

   b.  If, based upon the totality of the information available at the time of the report, the supervisor feels that the use of force may have been unreasonable or not within policy, the supervisor will: (04/16/12)

      ·  State in the supervisor force review that they believe the use of force requires further review; and
      ·  Notify the commander of Internal Affairs of their findings that the force requires further review.

5.  Review all sworn employees' CAPRS reports and supplements related to the use of force incident for completeness and accuracy.


## 5-308 NOTIFICATION OF FIREARM DISCHARGES (10/16/02) (04/30/15)

### A.  Employee Responsibility

Any employee who discharges a firearm, whether on or off duty, shall make direct contact with their immediate supervisor or the on-duty Watch Commander and the local jurisdiction as soon as possible **except**: (08/17/07) (04/30/15) (04/05/16)

   ·  While at an established target range;
   ·  While conducting authorized ballistics tests;
   ·  When engaged in legally recognized activities while off-duty.

### B.  Supervisor Responsibility

1.  The supervisor shall respond to any scene in which an employee has discharged a firearm while on-duty or in the course of duty. (04/30/15) (04/05/16)

2.  The supervisor is responsible for notifying the Watch Commander and when appropriate, the employee's Deputy Chief and the on-duty Homicide investigator. This does not include the discharge of a firearm with the intention of dispatching an animal, unless it results in injury to a person. (04/30/15) (04/05/16)

3.  Notifications to the Internal Affairs Unit shall be made in accordance with the Internal Affairs Call-Out Notification Policy (P/P 2-101). (04/05/16)

4. The advised supervisor shall ensure that drug and alcohol testing is conducted in accordance with the conditions and procedures in the MPD Drug & Alcohol Testing Policy (P/P Section 3-1000). (04/30/15)

5. At any officer-involved shooting incident in which a person is shot, the Critical Incident Policy (P/P Section 7-800) shall be followed. (04/30/15)

**C. Reporting Firearms Discharges to the State (10/16/02) (04/30/15)**

Minn. Stat. §626.553 requires the Chief of Police to report to the State Commissioner of Public Safety whenever a peace officer discharges a firearm in the course of duty, other than for training purposes or when killing an animal that is sick, injured or dangerous. Written notification of the incident must be filed within 30 days of the incident. The notification shall include information concerning the reason for and circumstances surrounding discharge of the firearm. The Internal Affairs Unit supervisor shall be responsible for filing the required form(s) with the State Bureau of Criminal Apprehension. (04/05/16)

## 5-309 WRITTEN REPORT ON DISCHARGE OF FIREARMS (10/16/02)

All employee firearm discharges that require notification, other than Critical Incidents, shall be reported in CAPRS, including a supplement, by the employee involved and the supervisor who was notified. The report shall be titled, "DISWEAP." The supervisor shall then complete a Supervisor Force Review. (08/17/07)

If the involved employee is unable to make a CAPRS report, the supervisor shall initiate the CAPRS report.

The Watch Commander shall include all case numbers on the Watch Commander log.

## 5-310 USE OF UNAUTHORIZED WEAPONS (10/16/02) (08/17/07)

Sworn MPD employees shall only carry and use MPD approved weapons for which they are currently trained and authorized to use through the MPD Training Unit. If an exigent circumstance exists that poses an imminent threat to the safety of the employee or the public requiring the immediate use an improvised weapon of opportunity, the employee may use the weapon. (08/17/07)

## 5-311 USE OF NECK RESTRAINTS AND CHOKE HOLDS (10/16/02) (08/17/07) (10/01/10) (04/16/12)



**DEFINITIONS I.**   *Important*

**Choke Hold:** Deadly force option. Defined as applying direct pressure on a person's trachea or airway (front of the neck), blocking or obstructing the airway (04/16/12)

**Neck Restraint:** Non-deadly force option. Defined as compressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck). Only sworn employees who have received training from the MPD Training Unit are authorized to use neck restraints. The MPD authorizes two types of neck restraints: Conscious Neck Restraint and Unconscious Neck Restraint. (04/16/12)

**Conscious Neck Restraint:** The subject is placed in a neck restraint with intent to control, and not to render the subject unconscious, by only applying light to moderate pressure. (04/16/12)

**Unconscious Neck Restraint:** The subject is placed in a neck restraint with the intention of rendering the person unconscious by applying adequate pressure. (04/16/12)

## PROCEDURES/REGULATIONS II.

A. The Conscious Neck Restraint may be used against a subject who is actively resisting. (04/16/12)
B. The Unconscious Neck Restraint shall only be applied in the following circumstances: (04/16/12)
1. On a subject who is exhibiting active aggression, or;
2. For life saving purposes, or;
3. On a subject who is exhibiting active resistance in order to gain control of the subject; and if lesser attempts at control have been or would likely be ineffective.
C. Neck restraints shall not be used against subjects who are passively resisting as defined by policy. (04/16/12)
D. After Care Guidelines (04/16/12)
1. After a neck restraint or choke hold has been used on a subject, sworn MPD employees shall keep them under close observation until they are released to medical or other law enforcement personnel.
2. An officer who has used a neck restraint or choke hold shall inform individuals accepting custody of the subject, that the technique was used on the subject.

## 5-312 CIVIL DISTURBANCES (08/17/07)

Civil disturbances are unique situations that often require special planning and tactics to best bring an unlawful situation under effective control. The on-scene incident commander shall evaluate the overall situation and determine if it would be a reasonable force option to use less-lethal or non-lethal weapons to best accomplish that objective.

Unless there is an immediate need to protect oneself or another from apparent physical harm, sworn MPD employees shall refrain from deploying any less-lethal or non-lethal weapons upon any individuals involved in a civil disturbance until it has been authorized by the on-scene incident commander.

The riot baton is a less-lethal weapon that shall only be deployed for carry or use during, or in anticipation to, a civil disturbance.

## 5-313 USE OF CHEMICAL AGENTS -- POLICY (10/16/02) (08/17/07) (10/01/10) (09/04/12)

The MPD approved chemical agent is considered a non-lethal use of force. The use of chemical agents shall be consistent with current MPD training and MPD policies governing the use of force (Policy and Procedure Manual, Sections 5-300 Use of Force).

Chemical agents, regardless of canister size, shall only be used against subjects under the following circumstances: (06/10/13)

· On subjects who are exhibiting Active Aggression, or;

· For life saving purposes, or;

· On subjects who are exhibiting active resistance in order to gain control of a subject and if lesser attempts at control have been or would likely be ineffective, or; (06/10/13)

· During crowd control situations if authorized by a supervisor. (See 5-312 Civil Disturbances) (09/04/12) (06/10/13)

- Determine if the person is injured or requires EMS
- When appropriate, visual inspect the areas struck for signs of injury
- Render medical aid consistent with training and request EMS response for evaluation at anytime if necessary

Sworn employees shall routinely monitor the medical condition of a person that has been struck with an impact weapon until they are released to medical or other law enforcement personnel. An officer who has used an impact weapon shall inform individuals accepting custody that it was used on the person. (10/01/10)

*Important*



**5-316   MAXIMAL RESTRAINT TECHNIQUE (05/29/02) (06/13/14) (07/13/17) (04/02/18)**

(B-C)

I.   **PURPOSE**
To establish a policy on the use of "hobble restraint devices" and the method of transporting prisoners who have been handcuffed with a hobble restraint applied.

II.   **POLICY**
The hobble restraint device may be used to carry out the Maximal Restraint Technique, consistent with training offered by the Minneapolis Police Department on the use of the Maximal Restraint Technique and the Use of Force Policy.

III.   **DEFINITIONS**
**Hobble Restraint Device:** A device that limits the motion of a person by tethering both legs together. Ripp Hobble ™ is the only authorized brand to be used.
**Maximal Restraint Technique (MRT):** Technique used to secure a subject's feet to their waist in order to prevent the movement of legs and limit the possibility of property damage or injury to him/her or others.
**Prone Position:** For purposes of this policy, the term Prone Position means to lay a restrained subject face down on their chest.
**Side Recovery Position:** Placing a restrained subject on their side in order to reduce pressure on his/her chest and facilitate breathing.

IV.   **RULES/REGULATIONS**
A.   **Maximal Restraint Technique – Use (06/13/14)**
1. The Maximal Restraint Technique shall only be used in situations where handcuffed subjects are combative and still pose a threat to themselves, officers or others, or could cause significant damage to property if not properly restrained.

2. Using the hobble restraint device, the MRT is accomplished in the following manner:
   a.   One hobble restraint device is placed around the subject's waist.
   b.   A second hobble restraint device is placed around the subject's feet.
   c.   Connect the hobble restraint device around the feet to the hobble restraint device around the waist in front of the subject.
   d.   **Do not** tie the feet of the subject directly to their hands behind their back. This is also known as a hogtie.
3. A supervisor shall be called to the scene where a subject has been restrained using the MRT to evaluate the manner in which the MRT was applied and to evaluate the method of transport.
B.   **Maximal Restraint Technique – Safety (06/13/14)**
1. As soon as reasonably possible, any person restrained using the MRT who is in the prone position shall be placed in the following positions based on the type of restraint used:
   a.   If the hobble restraint device is used, the person shall be placed in the side recovery position.
2. When using the MRT, an EMS response should be considered.
3. Under no circumstances, shall a subject restrained using the MRT be transported in the prone



position.

4. Officers shall monitor the restrained subject until the arrival of medical personnel, if necessary, or transfer to another agency occurs.

5. In the event any suspected medical conditions arise prior to transport, officers will notify paramedics and request a medical evaluation of the subject or transport the subject immediately to a hospital.

6. A prisoner under Maximal Restraint should be transported by a two-officer squad, when feasible. The restrained subject shall be seated upright, unless it is necessary to transport them on their side. The MVR should be activated during transport, when available.

7. Officers shall also inform the person who takes custody of the subject that the MRT was applied.

**C. Maximal Restraint Technique – Reporting (06/13/14)**

1. Anytime the hobble restraint device is used, officers' Use of Force reporting shall document the circumstances requiring the use of the restraint and the technique applied, regardless of whether an injury was incurred.

2. Supervisors shall complete a Supervisor's Force Review.

3. When the Maximal Restraint Technique is used, officers' report shall document the following:
   - How the MRT was applied, listing the hobble restraint device as the implement used.
   - The approximate amount of time the subject was restrained.
   - How the subject was transported and the position of the subject.
   - Observations of the subject's physical and physiological actions (examples include: significant changes in behavior, consciousness or medical issues).

## 5-317   LESS-LETHAL 40MM LAUNCHER AND IMPACT PROJECTILES (07/16/19)

**I.   PURPOSE**

**A.** The MPD recognizes that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems that require special training and equipment. The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations.

**B.** This policy addresses the use of the less-lethal 40mm launcher and the 40mm less-lethal round. The deployment of the 40mm launcher is not meant to take the place of deadly force options.

**II.   DEFINITIONS**

**40mm Less-Lethal round:** Direct fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject.

**III.   POLICY**

**A.** This policy applies to officers who are not working in a certified SWAT capacity.

**B.** The 40mm launcher with the 40mm less-lethal round should not be used in deadly force situations without firearm backup.

1. The use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the suspect's body that are considered unlikely to cause death or serious physical injury.

2. Prior to using less-lethal options, officers need to consider any risks to the public or themselves.

3. When using the 40mm less-lethal round, consideration shall be given as to whether the subject could be controlled by any other reasonable means without unnecessary risk to the subject, officers, or to the public, in accordance with knowledge and training in use of force and MPD policies governing the use of deadly and non-deadly force.

**C.** Only officers trained in the use of the 40mm launcher and 40mm less-lethal round are authorized to carry and use them.

**D.** Officers shall not deploy 40mm launchers for crowd management purposes.

**IV.   PROCEDURES/REGULATIONS**

**A.   Standard projectiles**

**5-314.02 USE OF CONDUCTED ENERGY DEVICES (CED) – SUBJECT FACTORS (10/01/10)**

Officers must consider the possible heightened risk of injury and adverse societal reaction to the use of CED's upon certain individuals. Officers must be able to articulate a correspondingly heightened justification when using a CED upon:

- Persons with known heart conditions, including pacemakers or those known to be in medical crisis;
- Elderly persons or young children;
- Frail persons or persons with very thin statures (i.e., may have thin chest
- walls);
- Women known to be pregnant;

Prior to using a CED on a subject in flight the following should be considered:

- The severity of the crime at issue;
- Whether the suspect poses an immediate threat to the safety of the officer or others, and;
- The officer has a reasonable belief that use of the CED would not cause significant harm to the subject fleeing unless use of deadly force would otherwise be permitted.

**5-314.03 USE OF CONDUCTED ENERGY DEVICES (CED) – SITUATIONAL FACTORS (10/01/10)**

In the following situations, CED's should not be used unless the use of deadly force would otherwise be permitted:

- On persons in elevated positions, who might be at a risk of a dangerous fall;
- On persons operating vehicles or machinery;
- On persons who are already restrained in handcuffs unless necessary to prevent them causing serious bodily injury to themselves or others and if lesser attempts of control have been ineffective.
- On persons who might be in danger of drowning;
- In environments in which combustible vapors and liquids or other flammable
- substances are present;
- In similar situations involving heightened risk of serious injury or death to the subject.

**5-314.04 USE OF CONDUCTED ENERGY DEVICES (CED) – DOWNLOADING/REPORTING (10/01/10) (07/16/12)**

Officers are required to report all actual use of their CED consistent with the downloading and reporting guidelines outlined below. (07/16/12)

CED Downloading guidelines:

- The CED (and camera if equipped) shall be downloaded, when used in probe mode or drive stun mode, prior to the end of the officer's shift.
- The CED (and camera if equipped) shall be downloaded for any incident that is recorded that the officer believes might have evidentiary value.
- If a CED was used during a critical incident, the CED will be property inventoried by the Crime Lab for processing video and firing data evidence.

CED Reporting guidelines:

- When a CED is deployed and discharged on a subject, the officer shall report its use in CAPRS (including a Use of Force Report and in the supplement) as well as on the officer's CED log. Officers shall document de-escalation attempts in the Use of Force Report and in their supplement.

(07/16/12)

- When a CED is only threatened by means of displaying, red dotting, and/or arcing in situations which normally would require a CAPRS report, the threatened use shall be reported in CAPRS in the supplement of the report as well as on the officer's CED log. (07/16/12)
- When a CED is only threatened by means of displaying, red dotting, and/or arcing without actually being deployed on a subject and there is no arrest or CAPRS report otherwise required, the officer may record this threatened use on their CED log and add such comments into the call. (07/16/12)

- When a CED is used during the scope of off-duty employment outside of the City (e.g. another law enforcement agency) officers shall obtain a Minneapolis CCN from MECC and complete a CAPRS report titled AOA and refer to their employer's incident report in the supplement. Officers shall then download the device and store the information under the Minneapolis CCN. (07/16/12)

## 5-314.05 USE OF CONDUCTED ENERGY DEVICES (CED) – POST EXPOSURE TREATMENT/MEDICAL AID (10/01/10)

Post exposure treatment (Medical Aid) for a person that has been exposed to the electricity from the CED shall include the following:

1. Determine if the subject is injured or requires EMS.
2. Render medical aid consistent with training and request EMS response for evaluation at anytime if necessary
3. Request EMS response for probe removal if probes are located in sensitive areas (face, neck, groin or breast areas).
4. Wear protective gloves and remove probes from the person's non-sensitive body areas.
5. Secure the probes (biohazard "sharps") point down into the expended cartridge and seal with a safety cover.
6. When appropriate, visually inspect probe entry sites and/or drive stun locations for signs of injury.
7. When appropriate, photograph probe entry sites and/or drive stun locations.

Sworn employees shall routinely monitor the medical condition of a person who has been exposed to the electricity from a CED until they are released to medical or other law enforcement personnel and inform individuals accepting custody that a CED was used on the person. (10/01/10)

## 5-315 USE OF IMPACT WEAPONS - POLICY (08/17/07) (10/01/10)

The MPD approved impact weapons (Policy and Procedure Manual, Section 3-200 Equipment) are considered less-lethal weapons. The use of impact weapons shall be consistent with current MPD Training and MPD policies governing the use of force (Policy and Procedure Manual, Section 5-300).

Strikes from impact weapons shall only be administered under the following circumstances:

- On subjects who are exhibiting active aggression, or;
- For life saving purposes, or;
- On subjects who are exhibiting active resistance in order to gain control of a subject and if lesser attempts at control have been or would likely be ineffective.

Strikes from impact weapons shall not be administered to persons who are non-compliant as defined by policy.

## 5-315.01 USE OF IMPACT WEAPONS – TREATMENT/MEDICAL AID (10/01/10)

Treatment (Medical Aid) for a person that has been struck with an impact weapon shall include the following:

and shall complete a report entitled "FORCE."
2. Officers who deploy a less-lethal round shall immediately notify dispatch, who will notify a supervisor.
3. A supervisor shall respond to the scene any time a 40mm less-lethal round is used. The responding supervisor shall review the incident and complete a use of force review in accordance with P&P 5-307.
4. Supervisors shall ensure that all spent 40mm less-lethal rounds are collected and property inventoried if possible.

# 5-318   REMOTE RESTRAINT DEVICE (10/18/19)

### I.   PURPOSE

A. The MPD recognizes that combative, non-compliant, armed or otherwise violent subjects cause handling and control problems that require special training and equipment.
B. The purpose of a remote restraint device is to facilitate a safe and effective response by immobilizing and controlling resistive or non-compliant persons and persons with known or suspected mental health issues, and minimizing injury to suspects, subjects, and officers.

### II.   DEFINITIONS

**Remote Restraint Device:** The BolaWrap™ is the only currently authorized remote restraint device. It is a hand-held device that discharges an eight-foot bola style Kevlar tether to entangle an individual at a range of 10-25 feet.

### III.   POLICY

A. The remote restraint device has limitations and restrictions requiring consideration before its use. The device shall only be used when its operator can safely approach the subject within the operational range of the device. Although the device is generally effective in controlling most individuals, officers should be aware that the device may not achieve the intended results and be prepared with other options.
B. The remote restraint device should not be used in potentially deadly force situations without firearm backup.
   1. When used according to the specifications and training, the device should be considered a low-level use of force.
   2. Prior to using the device, officers need to consider any risks to the public or themselves
C. Only officers trained in the use of the remote restraint devices are authorized to carry and use them.
D. Officers are only authorized to carry department remote restraint devices while on-duty in a patrol response function. Officers shall ensure that remote restraint devices are secured at all times.

### IV.   PROCEDURES/REGULATIONS

A. **Standard devices**
   Officers shall only carry MPD-approved remote restraint devices, cartridges and cutters. No personally owned remote restraint devices shall be carried or used.
B. **Target areas**
   1. Reasonable efforts should be made to target lower extremities or lower arms.
   2. The head, neck, chest and groin shall be avoided.
   3. If the dynamics of a situation or officer safety do not permit the officer to limit the application of the remote restraint device to a precise target area, officers should monitor the condition of the subject if it strikes the head, neck, chest or groin until the subject is examined by paramedics or other medical personnel.
C. **Deployment**
   1. The remote restraint device may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably

device to alert dispatch and other officers that the sound was a device being discharged.

    d.  The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the officer deploying the remote restraint device in the related report.

## E. Carrying and storage

1. Officers shall only use department-approved remote restraint devices that have been issued by the Department.
2. Only officers who have successfully completed department-approved training may be authorized to carry and deploy the remote restraint device.
3. All remote restraint devices are clearly and distinctly marked to differentiate them from the duty weapon and any other device.
4. Uniformed and plainclothes officers who have been authorized to carry the remote restraint device shall wear the device in an approved holster on their person or keep the device safely and properly stored in their City vehicle.
5. Officers shall ensure that their remote restraint device is properly maintained and in good working order. Officers shall notify the Training Division of any issues, as the Training Division is in charge of inventory and maintenance of the devices.
6. Officers should not hold both a firearm and the remote restraint device at the same time.

## F. Medical treatment

1. Medical assistance shall be rendered as necessary in accordance with P&P 5-306 and the Emergency Medical Response policy (P&P 7-350).

    a.  Additionally, any such individual who falls under any of the following categories should, as soon as practicable, be examined by paramedics or other qualified medical personnel:

        ·  The person is suspected of being under the influence of controlled substances or alcohol.
        ·  The person may be pregnant.
        ·  The remote restraint device pellets are lodged in a sensitive area (e.g., groin, female breast, head, face, neck).

2. Officers on scene shall determine whether transporting the person to a medical facility is necessary to remove the pellets or barbs.
3. If officers determine that cutting the tether is reasonable and appropriate, officers may cut the tether at the scene using medical scissors.

## G. Use of Force reporting

1. Officers that deploy a remote restraint device shall report the force in accordance with P&P 5-306, and shall complete a report entitled "FORCE."
2. If a supervisor was not notified prior to deployment, officers who deploy the remote restraint device shall notify a supervisor to respond to the scene.
3. Officers shall document any injuries or points of contact, with photographs whenever possible.
4. A supervisor shall respond to the scene any time a remote restraint device is used. The responding supervisor shall review the incident and complete a use of force review in accordance with P&P 5-307.
5. Supervisors shall ensure that all expended cartridges, pellets, barbs and cord are collected and property inventoried if possible.

## H. Transport of subjects

If an officer transports the subject, the transporting officer shall inform any person providing medical care or receiving custody that the individual has been subjected to the application of the remote restraint device.

## I. BolaWrap™ pilot device form

1. In addition to incident and force reporting, deployment of the remote restraint device shall be documented by each discharging officer using the BolaWrap™ Test and Evaluation form. The following information is required on the form:

        ·  Device and cartridge serial numbers.
        ·  Date, time and location of the incident.
        ·  Whether any display or laser deterred a subject and gained compliance.
        ·  Number of device activations and the duration between activations.

EXH-E    1 of 2

COUNTY OF PIMA

SS.

STATE OF ARIZONA

---
**AFFIDAVIT**
---

I, Mr. Derek Michael Chauvin, am the affiant. Under the penalty of perjury, 28 U.S.C. 1746, affiant declares the following particulars are true and correct:

1. On May 25 2020, I found probable cause existed to arrest Mr. George Perry Floyd, Jr. ("Floyd") for the following reasons: On the above listed date I was assigned to marked Minneapolis Police Department squad 330 along with Officer Thao. We were dispatched to a forgery in progress call at Cup Foods located at 3759 Chicago Av S. Remarks had stated that a black male entered the business and used a reported "fake twenty dollar bill" in U.S. currency to pay for cigarettes. The caller was an employee of the above listed business.

2. Remarks stated this male later identified as arrested person/Floyd was intoxicated and not in control of himself. He was described as over six feet tall and was said to be sitting on the hood of a dark blue Mercedes Benz SUV parked nearby. Squad 320 (Officer Kueng and Officer Lane) had advised dispatch by radio they would take the call. I heard them air they were out with the vehicle listed in the call and were removing an occupant. We responded code 3 (lights and sirens) to assist.

3. Upon arrival I observed a Minneapolis Park Police Officer (Chang) standing with a male and a female on the sidewalk near the listed vehicle. He pointed toward the north on Chicago Av S where squad 320 was parked. I walked over to the vehicle where I met with Officer Kueng who was attempting to get Floyd seated in the back seat of the squad car.

4. Floyd was struggling with Officer Kueng and refusing to sit down in the back seat so the door could be closed. Floyd was yelling statements such as "I'm claustrophobic" and "I can't choke...I can't breathe". In fact Floyd started saying "I can't breathe" multiple times while still standing upright. Floyd also had foam coming from his mouth. Floyd continued to resist efforts to have him sit in the back seat of the squad car. I directed Officer Lane to pull Floyd into the backseat area so the doors could be secured. Officer Kueng had closed the rear drivers side door.

5. However Floyd continued to struggle in the backseat causing the squad car to shake and banged his head against the plexiglass partition between the front and rear seat areas. This action caused his nose to bleed. Floyd was able to push against the closed door with his feet and legs in an attempt to propel himself out of the back seat of the squad car. Floyd was yelling he wanted to go to the ground.

6. I attempted to push Floyd back into the back seat by pulling on his left shoulder with my right hand reaching across his body and pushing on his back with my left hand. I was unsuccessful in getting him back inside the vehicle. The decision was made we would remove Floyd to perform an MRT.

7. Immediately upon removing Floyd and bringing him to the "ground" per his request, Floyd kicked Officer Lane. I had asked if Floyd was going to jail and was told "He is under arrest for forgery right now" by Officer Kueng. I had inquired if a "hobble" device was available. This is referring to the MPD issued Ripp Restraint device.

8. Floyd was placed into the MPD trained MRT position which is prone on a given surface. I used left leg pressure using my shin on the posterior side of his body high up for leverage purposes. The technique is contacting the tops of shoulder blades, the spinal column in the middle, and related muscle and connective tissue. The right leg is contacting the lower portion of the shoulder blade as trained. An MRT is typically performed with two or more officers. Officer Lane was able to secure Floyd's ankles. Officer Kueng was able to secure Floyd's legs.

9.  It should be noted Floyd was able to lift and turn his head during the use of the technique.  There was no contact with any carotid arteries or the trachea area.  Floyd was also positioned on the left side of his chest.  There was space between his right chest muscles and the street surface.

10.  The decision was made to not apply the Ripp Restraints as it was believed HCMC medics would be imminently arriving.  Ambulance had been requested in approximately 36 seconds of bringing Floyd to the ground.  An additional request was made to have them respond code 3.  The MRT was maintained to keep control of Floyd's movements to prevent any further assault against officers or him attempting to hurt himself by getting up and running into the street.  We were all on the side of the squad car facing Chicago Av S with vehicles moving past.

11.  Floyd had presented Cup Foods with a counterfeit twenty dollar bill of U.S. currency in order to obtain goods or services from the business.  In this case it was presented to purchase cigarettes.  The actual counterfeit bill presented was turned over to officers as evidence.  Floyd presenting the counterfeit currency was in direct violation of Minnesota Statute 609.632 Subdivision 3.  Uttering or possessing.  The statute states "Whoever, with intent to defraud, utters or possesses with intent to utter any counterfeit United States postal money order, United States currency, Federal Reserve note, or other obligation or security of the United States, having reason to know that the money order, currency, note, or obligation or security is forged, counterfeited, falsely made, altered, or printed, is guilty of offering counterfeited currency and may be sentenced as provided in subdivision 4."

12.  Under M.S. 609.632 Subdivision 4(b)(4) the penalty is imprisonment for not more than one year or to payment of a fine of not more than $3000, or both, if the counterfeited item is used to obtain or in an attempt to obtain property or services having a value of no more than $1000, or the aggregate face value of the counterfeited item is no more than $1000.

13.  The above offense is a gross misdemeanor and is not eligible for citation.  It is a bookable offense for Hennepin County Jail.

14.  Floyd was initially located by Officer Lane and Officer Kueng sitting in the drivers seat of the dark blue Mercedes Benz SUV displaying Minnesota license plates.  Floyd was believed to be impaired and had been making evasive movements while inside the SUV.  Floyd kept turning his head and upper body away toward the passenger seat.  It was believed he was attempting to conceal items or reach for a weapon near the center console area.  This caused Officer Lane to draw his firearm and point it at Floyd.  Floyd was ordered from the vehicle at gunpoint.  Floyd struggled against Officer Lane who was attempting to handcuff Floyd.  Officer Kueng had to move from his position on the passenger side of the vehicle to assist in cuffing Floyd.

15.  Floyd was located in the drivers seat of a motor vehicle with the belief he was impaired.  It was believed he was possibly under the influence of PCP.  Minnesota Statute 169A.20 subdivision 1 (Driving while impaired crime; motor vehicle) states "It is a crime for any person to drive, operate, or be in physical control of any motor vehicle, as defined in section 169A.03, subdivision 15, except for motorboats in operation and off-road recreational vehicles, within this state or on any boundary water of this state when: (1) the person is under the influence of alcohol; (2) the person is under the influence of a controlled substance; (3) the person is under the influence of an intoxicating substance and the person knows or has reason to know that the substance has the ability to cause impairment; (4) the person is under the influence of a combination of any two or more of the elements named in clauses (1) to (3); (5) the person's alcohol concentration at the time, or as measured within two hours of the time, of driving, operating, or being in physical control of the motor vehicle is 0.08 or more; (6) the vehicle is a commercial motor vehicle and the person's alcohol concentration at the time, or as measured within two hours of the time, of driving, operating, or being in physical control of the commercial motor vehicle is 0.04 or more; or (7) the person's body contains any amount of a controlled susbstance listed in Schedule I or II, or its metabolite, other than marijuana or tetrahydrocannabinols."

16.  Floyd would have been arrested and transported to the Minneapolis Chem Test Unit to read the Minnesota Motor Vehicle Implied Consent Advisory on recorded video.  The vehicle that Floyd was located in would have been towed and held as evidence for the DWI offense.  Floyd would have then been taken to Hennepin County Medical Center for a legal blood draw after a search warrant was obtained.  If officers were not able to transport Floyd to Chem Test, the Implied Consent Advisory would have been read at HCMC using body camera while awaiting the search warrant for the blood samples.

17.  Floyd would have been booked at Hennepin County Jail for Fourth-Degree Driving While Impaired under M.S. 169A.27 subdivision 2.  This is a misdemeanor offense not eligible for citation.

Your Affiant Further Sayeth Naught,

x_____     Date: 11 / 02 2023

MR. DEREK M CHAUVIN