UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 21-108(1) (PAM/TNL) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **DEFENDANT'S REPLY BRIEF** |
| | ) | |
| DEREK MICHAEL CHAUVIN, | ) | |
| | ) | |
| Defendant. | ) | |

Derek Chauvin contends that the Court should grant his habeas motion on the ground that he was denied the effective assistance of counsel. Mr. Nelson's representation of Mr. Chauvin was ineffective for two reasons. First, Mr. Nelson failed to inform Mr. Chauvin that a Doctor William Schaetzel had contacted Mr. Nelson and opined that Mr. Chauvin did not cause Mr. Floyd's death. Dr. Schaetzel reached out to Mr. Nelson in April 2021 before Mr. Chauvin was even indicted federally. And yet Mr. Chauvin was not informed of this exculpatory opinion evidence before he decided to plead guilty in federal court. The first ground is thus a claim that Mr. Nelson provided ineffective assistance of counsel to Mr. Chauvin by failing to consult with him on this issue. Mr. Chauvin also requests an evidentiary hearing on this ground, as explained more fully below.

The second ground is related, though independent. Dr. Schaetzel's opinion is that Mr. Floyd died due to a catecholamine crisis when his paraganglioma secreted excessive levels of catecholamines. Dr. Schaetzel urged that samples preserved from Mr. Floyd be tested for catecholamines and their

1

metabolites, and that tissue sections of Mr. Floyd's heart be examined. These tests and examinations would support Dr. Schaetzel's opinion about what caused Mr. Floyd to die if high levels of catecholamines or their metabolites were discovered. But Mr. Nelson never ordered these tests.

Mr. Chauvin urges the Court to hold an evidentiary hearing and decide this case based on the first ground: failure to consult. In the interest of judicial economy, ruling on the second claim can be postponed. Afterall, if Mr. Chauvin prevails on his first claim, there is no need to proceed to the second. But if Mr. Chauvin does not prevail on his first claim, he asks that the Court allow him leave to take discovery to perform the necessary tests. This request to conduct discovery is explained more fully below.

## 1.  Ineffective-assistance-of-counsel claims generally

To prevail on a claim of ineffective assistance of counsel, Mr. Chauvin must show (1) that his counsel's performance was deficient and (2) that that deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This two-step framework is applicable to cases challenging guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

## 2.  Mr. Nelson rendered ineffective assistance by failing to inform Mr. Chauvin of evidence that he did not cause George Floyd's death

An attorney's duty to consult with his client is at the heart of effective assistance of counsel. In medicine, the doctrine of informed consent ensures

that the patient is ultimately responsible for decisions affecting his own health. A doctor who treats a patient must advise the patient of "the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments." *E.g.*, Wis. Stat. Ann. § 448.30. This then allows the patient to intelligently choose whether to receive treatment and which treatment to receive, thereby ensuring that the patient is the ultimate decisionmaker when it comes to their own health. If a doctor informs a patient with a serious condition of just one risky treatment when there are other reasonable alternate treatments for that condition, some of which are less risky, the patient's decision to undergo the risky treatment is not based on informed consent. And this means that the decision to undergo treatment was not really the patient's decision, but the doctor's. By failing to adequately advise the patient, the doctor usurped control from the patient.

In law, the duty to consult serves the same function as informed consent. It ensures that the client, whose life and liberty is at stake, is truly represented, and is not merely the unwitting and unwilling subject of the repercussions. No matter how talented the attorney, absent reasonable consultation with the client, his talent serves only his ego, not the client. Mr. Nelson breached his duty to consult with his client. By failing to inform Mr. Chauvin of the doctor's opinion that Mr. Floyd's paraganglioma caused his death, not Mr. Chauvin—Mr. Nelson rendered ineffective assistance of counsel.

**A.     *Mr. Nelson failed to inform Mr. Chauvin of the doctor's opinion***

Dr. William Schaetzel, a forensic pathologist, is of the opinion that Mr. Floyd died from his paraganglioma releasing excessive amounts of catecholamines, which then precipitated acute heart failure. The autopsy report indicates that Mr. Floyd had a paraganglioma in his left pelvic region. (Docket Entry (DE) 544-1 at 12, 23-24.)

Dr. Schaetzel has set forth his opinion on the cause of Mr. Floyd's death in great detail. (DE 544-1 at 3-5.) Paraganglioma's are a tumor. (DE 544-1 at 3, 12, 24). They can "produce abnormally high levels of catecholamines, typically either adrenaline or noradrenaline. These hormones are so biologically potent molecules that we measure their levels in picograms," which is "one trillionth of a gram." You've experienced the "symptoms of circulating adrenaline" at "normal physiological amounts" when you are "angry or scared." Paragangliomas "can be set off by emotional or physical manipulation" to secrete much more than this: "multiple of normal amounts." (*Id.* at 3.) "When the tumor releases these excessive amounts, the person experiences a catecholamine crisis. The symptoms and sheer terror a person experiences during" such a crisis is outside most people's experience or comprehension. (*Id.*) "These people are literally scared to death." (*Id.*)

Dr. Schaetzel's professional opinion is that Mr. Floyd died from a catecholamine crisis: "[t]here is no doubt, in my opinion, that Mr. Floyd died as a result of a catecholamine crisis after being startled by Officer Lane, which then precipitated Takotsubo's myocarditis (acute heart failure) with resultant

pulmonary edema and death." *Id.* So Dr. Schaetzel's opinion is that Mr. Floyd's death was inevitable irrespective of Mr. Chauvin's actions. (*Id.* at 3-5.) The catecholamine crisis that led to Mr. Floyd's death began when Officer Lang startled Mr. Floyd in his car. (*Id.*) By the time Mr. Floyd was standing by the squad car, he was moribund (doomed to die). (*Id.*)

Significantly, Dr. Schaetzel explained that the downstream consequences of the acute heart failure (Takotsubo's myocarditis) include blood leaking into the lungs, which interferes with breathing, thereby causing the "sensation that we can't catch our breath." (*Id.* at 3.) Another consequence of the catecholamine crisis Mr. Floyd was experiencing was confusion, disorientation, becoming panicky, a sense of doom and terror, claustrophobia, muscle weakness, and difficulty breathing (*Id.* at 4, 11.)

Dr. Schaetzel attempted to contact Mr. Nelson by phone and email to share his opinion that Mr. Chauvin did not cause Mr. Floyd's death. (*Id.* at 11.) He left messages. (*Id.*) He called other attorneys in an attempt to have them facilitate a conversation with Mr. Nelson. (*Id.*) All to no avail. At least one of the emails he sent Mr. Nelson was in April 2021.

Mr. Nelson did not inform Mr. Chauvin of Dr. Schaetzel's opinion, nor did he share with him that another doctor, Dr. Haney, had also opined that Mr. Chauvin did not cause Mr. Floyd's death. (DE 544 at 2.)

**B.    *Mr. Nelson's failure to inform Mr. Chauvin of the doctor's opinion was ineffective assistance of counsel***

The United States Constitution makes a criminal defendant "the master of his or her own defense." *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992). The Sixth Amendment bestows on the defendant *personally* the rights necessary to a full defense. The Amendment's text makes that plain: "[i]n all criminal prosecutions, *the accused shall enjoy the right to* . . . ." (Emphasis added.) As the Supreme Court has explained, "the Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. . . . The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Faretta v. California*, 422 U.S. 806, 819-20 (1975).

The right to "assistance of counsel," guaranteed by the Sixth Amendment, is in keeping with this design. The key word that defines the attorney-client relationship is *assistance*. "[A]n assistant, however expert, is still an assistant." *Id.* at 820. And an attorney's role, properly understood as an assistant, matters. For example, if the state could force counsel on an unwilling defendant, "counsel is not an assistant, but a master." *Id.* That's why the Supreme Court held in *Faretta* that the Sixth Amendment right to assistance of counsel guarantees a defendant the right to represent himself. The Court reasoned that if the State could force counsel on an unwilling defendant, "counsel is not an assistant, but a master." *Id.* That violates the logic of the Sixth Amendment.

The duty of consultation is the mechanism by which the attorney remains always the assistant to his or her client, not some benevolent master. For that reason, the Supreme Court has recognized the duty of consultation as one of the most "basic duties" inherent to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 688 (1983). "Representation of a criminal defendant entails certain basic duties. . . . . From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.*

Even with respect to those questions of trial strategy on which counsel is the final decisionmaker, the duty of consultation ensures that the defendant is a knowing participant in the defense, not simply its object. A defendant deprived of meaningful consultation with counsel about the defense strategy is in essentially the same position as the defendant forced to accept counsel against his will. For either, "the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." *Faretta*, 422 U.S. at 821 (emphasis added).

That's why standards of conduct prescribed by the legal profession are unequivocal that important tactical decisions left to counsel are to be made only "after consultation with client." ABA Criminal Justice Standards for the Defense Function § 4-5.2(d) (4th ed. 2017) (available at https://www.americanbar.org/groups/criminal_justice/standards/DefenseFu

7

nctionFourthEdition/ (last accessed July 31, 2024)).[1] Similarly, those decisions left to the defendant are to be made "after full consultation with counsel." *Id.* at § 4-5.2(b). Counsel's obligation to advise the defendant is so central to the ABA's Criminal Justice Standards that it gets its own section: § 4-5.1 (Advising the Client). *Id.* For example, "before significant decision-points . . . defense counsel should advise the client with candor concerning all aspects of the case." *Id.* § 4-5.1(b). Similarly, "defense counsel should promptly communicate to the client . . . all significant developments." *Id.* § 4-5.1(c). And defense counsel should advise the defendant "sufficiently in advance of decisions to allow the client to consider available options, and avoid unnecessarily rushing the accused into decisions." *Id.* 4-5.1(e). In keeping with the role of counsel to assist the defendant, counsel is obligated to ensure that the client has sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued. Minn. Rules of Professional Conduct Rule 1.4 and comment 5 (2024); Rule 1.2(a) (2024) (mandating that a lawyer shall consult with the client as to the means by which the objectives of representation are to be pursued).

So there is little question that the duty to consult with the client about important issues of defense strategy is so fundamental to the *assistance* of counsel guaranteed by the Sixth Amendment that the breach of that duty may

---

[1] *Strickland* recognized that these professional standards of practice are important guides to determining what is reasonable when evaluating an ineffective-assistance claim. *Strickland*, 466 U.S. at 688; *accord Nix v. Whiteside*, 475 U.S. 157, 165 (1986).

constitute ineffective assistance. "Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Beavers v. Balcom*, 636 F.2d 114, 116 (5th Cir. 1981). Indeed, the Eighth Circuit has reasoned that counsel's decision to forgo a defense would be deficient performance only if the client were opposed to that decision or were not informed: counsel's strategy not to rely on an insanity defense "would be professionally irresponsible only if [client] were opposed to it or were not adequately informed of his choices." *Weekley v. Jones*, 76 F. 1459, 1462 (8th Cir. 1996).

Given that courts have held that the failure to consult on matters of defense strategy—which are decisions relegated to the attorney's final decision, not the client's—can constitute ineffective assistance, it follows by even stronger force of logic that failure to consult can constitute ineffective assistance of counsel when the failure to consult implicates the defendant's decision to plead guilty or not. Mr. Nelson knew about Dr. Schaetzel's opinion by at least April 2021, which was before Mr. Chauvin pled guilty in December 2021. Failing to inform him of this opinion—an opinion that, if accepted by a jury, would defeat the government's argument that Mr. Floyd's death resulted from Mr. Chauvin—amounted to deficient performance.

This conclusion is buttressed by the fact that in evaluating a claim of failure to consult, the wisdom of the defense strategy ultimately pursued by counsel is irrelevant. Absent consultation, the client is not truly represented, and the defense strategy is not truly his, no matter how well formed that

defense strategy may be. Similarly, when the client decides to plead guilty without being informed that evidence exists which could defeat the claim that he caused the victim's death, then the client's decision to plead guilty is not truly his own. By withholding this information, his attorney has deprived him of the ability to make this significant decision only after receiving effective assistance of counsel. Like the right to be present or the right to represent oneself, reasonable consultation ensures that the defendant—the person who "will bear the personal consequences of the conviction"—can personally oversee his own defense.

Doing a deep dive on a case involving the failure to consult on a matter left to the attorney—which again, is a weaker case concerning the duty to consult than this case because the decision whether to plead is a matter that was left to Mr. Chauvin—bolsters the conclusion that Mr. Nelson provided ineffective assistance of counsel in the present case.

"The constitutional duty to consult regarding issues on which counsel has the last word requires only that counsel act reasonably in light of the circumstances and what is likely to be accomplished by the consultation." *Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1437 (3rd Cir. 1996). Put another way, consultation need only be reasonable under all of the circumstances to comport with constitutional standards.

The holding and reasoning of *Weatherwax*—and crucially, how that case is fundamentally distinguishable from this one—teaches that Mr. Nelson was ineffective in failing to inform Mr. Chauvin of the doctor's opinion. Weatherwax

brought a habeas petition claiming ineffective assistance of counsel. He complained that his attorney failed to notify the court that on the last day of trial, one of the jurors was seen with a newspaper which contained a damaging account of the trial. Weatherwax and his family asked the attorney to do something about this problem. After discussing the matter with Weatherwax and his family, the attorney made a tactical decision not to notify the court because he believed that the jury was favorable disposed toward his client.

The Third Circuit held that the attorney's tactical decision was reasonable under prevailing professional norms. *Id.* at 1432. It also held that the decision whether to raise the possible jury taint was a non-fundamental issue reserved to counsel for final decision. But that was not the end of the court's inquiry. Nothing that "[i]mportant strategic and tactical decisions should be made only after a lawyer consults with his client," *id.* at 1436, the court next considered whether the attorney rendered ineffective assistance of counsel by failing to adequately consult with his client before deciding not to raise the issue.

The court reasoned that the "requirement that counsel consult with his or her client concerning issues on which counsel has the final word serves a number of important purposes." *Id.*

> First, it assures that the client will have the opportunity to assist with his own defense. As one court has noted, "while an attorney's education and experience give him superior knowledge of generalized technical information, 'the client possesses superior knowledge of another sort—knowledge of the facts and circumstances of his case.'" *Stano v. Dugger*, 921 F.2d 1125, 1146 n. 33 (11th Cir. 1991) . . . . Second, the client's views and desires

11

concerning the best course to be followed are relevant
considerations that must be evaluated and taken into account by
counsel. Without consultation, the views and desires of the client
may not be known to counsel. Third, consultation serves to
promote and maintain a cooperative client-counsel relationship.

.    .    .

Consultation between counsel and client may in some
circumstances serve a fourth purpose. *If the client learns from a
consultation that counsel is going to pursue a strategy contrary to
the client's wish and the matter is important enough to the client to
forego the benefits of his current representation, the consultation
may afford the client an opportunity to seek different representation.*

*Weatherwax*, 77 F.3d at 1436-37 (cleaned up) (emphasis added).

The court concluded that in light of these salutary purposes and the

circumstances of the case, defense counsel had acted reasonably in consulting

with his client. First, before making his decision, he had discussed the matter

with Mr. Weatherwax and his family. Each family member had had an

opportunity to state their opinion, and counsel had explained his view that this

was the best jury that Mr. Weatherwax could hope for. *Id.* at 1436. Counsel

discussed the pros and cons of the tactical decision with his client before

making a final decision. *Id.* at 1438. Mr. Weatherwax's complaint was not that

he was not consulted, but rather that his request that counsel notify the court

was not followed. *Id.* at 1436.

Second, the issue arose unexpectedly on the trial's last day. Counsel was

just entering the courtroom, and the prosecution's rebuttal case was about to

begin when he was notified of the problem. *Id.* at 1428. The court reasoned

that when decisions must be made in the heat of battle, the opportunity for meaningful consultation does not exist. *Id.* at 1437.

Finally, the court noted that further consultation about counsel's final decision would have served no purpose. Counsel was already aware of his client's view and had already offered his. He had no reason to believe that if he had notified his client that he had decided not to make a motion, Mr. Weatherwax would have sought to change representation or that if he had, the court would have allowed it. *Id.* at 1437. So the course of events would not have changed had further consultation occurred. *Id.*; *accord id.* n.6.

*Weatherwax* is sharply distinguishable from the present case. Most fundamentally, *Weatherwax* involves an issue of trial strategy over which the attorney has the final say. But the present case involves an issue over which Mr. Chauvin has the final say: namely, would he have decided to forgo a plea and proceed to trial had his attorney notified him of Dr. Schaetzel's opinion that Mr. Chauvin did not cause the death of Mr. Floyd. Common sense dictates that the duty to consult on decisions on which the client has the final say is greater than on decisions where the attorney has the final say. And it's not just common sense, the ABA standards discussed earlier have a heightened consultation standard on client-final-say decisions as opposed to attorney-final-say decisions. For the former, the attorney must provide "full consultation" before the decision is made; whereas the latter requires only that the decision be made "after consultation with the client where feasible and

13

appropriate." *Compare* ABA Criminal Justice Standards for the Defense Function § 4-5.2(b), *with id.* § 4-5.2(d).

Mr. Nelson's decision to not inform Mr. Chauvin of the doctor's opinion was not made in the heat of battle. We know that Dr. Schaetzel emailed Mr. Nelson by at least April 17, 2021. (DE 544-1 at 11.) That was before Mr. Chauvin was even indicted in May 2021 on this case. (DE 1.) Moreover, Dr. Schaetzel stated that after he got no response to his email to Mr. Nelson, he started calling the parties, but he was never able to reach Mr. Nelson. (DE 544-1 at 11.) Dr. Schaetzel even went so far as to call a different attorney to see if that attorney could help put him in touch with Mr. Nelson. Given that Dr. Schaetzel emailed Mr. Nelson before Mr. Chauvin was even indicted federally, there was absolutely zero time pressure from being in the heat of the battle that prevented Mr. Nelson from communicating this information to Mr. Chauvin and consulting with him about it. And yet Mr. Nelson did not provide this information to Mr. Chauvin: Mr. "Nelson did not even notify defendant of Schaetzel's existence or allow defendant to make an informed decision on whether to call Schaetzel as a defense witness or to plead in this case." (DE 544 at 2.)

Moreover, unlike *Weatherwax*, early consultation in the present case would have served the very purposes for which full consultation was mandated by the standards of the profession. Mr. Chauvin has asserted that had he known of Dr. Schaetzel's existence and opinion, he would not have pled guilty and instead would have gone to trial. (DE 544 at 2.) This is precisely why the

14

professional standards provide that decisions left to the client should be made only "after full consultation with defense counsel." ABA Criminal Justice Standards for the Defense Function § 4-5.2(b).

In *Weatherwax*, the tactical decision at issue related to a matter collateral to the defense itself. But here, the information went to the heart of the representation. Dr. Schaetzel's opinion was that Mr. Floyd's death was caused by a catecholamine crisis stemming from Mr. Floyd's paraganglioma when he was startled by Officer Lane. (DE 544-1 at 3-5.) Dr. Schaetzel's opinion is that once the catecholamine crisis started and Mr. Floyd was standing beside the squad car, Mr. Floyd was moribund. (*Id.* at 3-4.) This "means that death is inevitable no matter what you do to the patient." (*Id.* at 3.) Significantly, this is before Mr. Floyd was in the prone position on the street with Mr. Chauvin on top of him. And Mr. Schaetzel's opinion fits with the facts: Mr. Floyd's behavior following being startled by Officer Lane fits with what would happen in Dr. Schaetzel's opinion. Mr. Floyd became confused, delirious, panicky, had a sense of doom and terror, experienced muscle weakness, and he stated that he couldn't breathe, even before officers were on him in the prone position. (*Id.* at 3-5, 11.) This opinion, if credited, defeats the government's argument that Mr. Floyd's death resulted from Mr. Chauvin's actions. Put another way, it would negate the conclusion that Mr. Chauvin caused Mr. Floyd's death.

Likely sensing their weakness on this point, the government counters that Mr. Chauvin's arguments are defeated by *Burrage v. United States*, 571

U.S. 204, 211 (2014). (DE 553 at 11-12.) They argue that *Burrage* teaches that when a victim's death has multiple but-for causes, then each but-for cause still satisfies the "results from" statutory language even though there are multiple but-for causes.

But the government's quote from *Burrage* shows why their argument is mistaken as it applies to Dr. Schaetzel's opinion. The *Burrage* court explained that "if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Burrage*, 571 U.S. at 211; DE 553 at 11. But Dr. Schaetzel's opinion is that Mr. Floyd was moribund by the time he was standing outside the squad car. (DE 544-1 at 3-4.) In other words, he was going to die whether or not he was placed in the prone position with Mr. Chauvin on top of him. So even without the incremental effect of Mr. Chauvin on top of Mr. Floyd on the road, Mr. Floyd would still have died. This is not the same as the effect of the poison in the *Burrage* quote. Without the incremental effect of the poison, the victim would have lived. Not so with Mr. Floyd under Dr. Schaetzel's opinion. Even absent Mr. Floyd being placed in the prone position with Mr. Chauvin on top of him, he was going to die. The catecholamine crisis rendered him moribund when he was standing by the squad car before being placed in the prone position with Mr. Chauvin on top of him.

Finally, unlike *Weatherwax*, here there was no consultation, no discussion of the "pros and cons of a tactical decision" before it was made. 77

F.3d at 1438. To the contrary, Mr. Nelson did not inform Mr. Chauvin of Dr. Schaetzel's opinion before he pled guilty. (DE 544 at 2.) In fact. Mr. Chauvin did not learn of Dr. Schaetzel's opinion until 2023, well after he pled guilty and had been sentenced. (*Id.*)

Mr. Nelson's failure to consult with Mr. Chauvin about an expert opinion that Mr. Chauvin was not the cause of Mr. Floyd's death constituted ineffective assistance of counsel. Without this crucial information, Mr. Chauvin's decision to plead guilty was not informed and was not truly his decision. By failing to provide this information, the attorney effectively made himself the master of the representation, not the assistant. *Faretta*, 422 U.S. at 820. Keep in mind that Mr. Chauvin is not an attorney. In cases where the defendant does not have the specialized training of a lawyer, it is even more imperative that counsel adequately consult and advise a defendant before he or she makes the extremely consequential decision to plead guilty. In effect, the defense that Mr. Chauvin received was "not the defense guaranteed him by the Constitution, for, in a very real sense, it [was] not *his* defense." *Id.* at 821. And yet it was Mr. Chauvin who suffered the consequences when Mr. Nelson failed to adequately consult with him. By failing to inform his client, Mr. Nelson deprived Mr. Chauvin of the right to make an informed decision about whether to plead guilty or go to trial. Mr. Chauvin was denied effective assistance as a result.

### C. *Mr. Chauvin was prejudiced by Mr. Nelson's failure to inform him of the new defense*

The prejudice inquiry in guilty plea cases is nuanced. When a claim of ineffective assistance "involves a claim of attorney error during the course of a legal proceeding," then a defendant can "demonstrate prejudice by showing a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lee v. United States*, 582 U.S. 357, 364 (2017) (internal quotation marks and citation omitted). But when the claim is that the deficient performance arguably led to a proceeding being forfeited—like in this case, where Mr. Chauvin claims that Mr. Nelson's ineffective assistance led him to plead guilty and forgo trial—the inquiry is different. *Id.* "That is because while we ordinarily apply a strong presumption of reliability to judicial proceedings, we cannot accord any such presumption to judicial proceedings that never took place." *Id.* (internal quotation marks omitted).

The question is not "whether, had he gone to trial, the result of that trial would have been different than the result of the plea bargain." *Id.* The question is whether "the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Hill*, 474 U.S. at 59).[2]

---

[2] Phrasing these concepts slightly differently may be helpful in elucidating the nuance. Had the asserted error arisen in the context of a proceeding that is presumptively reliable, the possibility of a highly improbable event can be discounted in the prejudice inquiry. *Id.* at 368. Courts could for example ignore the possibility of jury nullification; *Strickland* remarked that "a defendant has

This "inquiry . . . focuses *on a defendant's decisionmaking*, which may not turn solely on the likelihood of success at trial." *Id.* at 367 (emphasis added). And because there was no proceeding to presume reasonable (in the present case, for instance, there was no trial), we instead ask "what an individual defendant would have done," which in turn means that "the possibility of even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking." *Lee*, 582 U.S. at 368.

In the present case, the error affected and in fact disrupted Mr. Chauvin's decision-making entirely. He was not informed of an expert opinion that he did not cause Mr. Floyd's death, and not being consulted and advised about this, his decision to plead was not informed. The error went to the heart of his decision-making process.

Look at the context in which he pled guilty. He had been convicted in state court after a trial. He had a defense expert in his trial, who testified that the paraganglioma was a "contributory condition" to Mr. Floyd's death, but on cross the expert clarified that the paraganglioma *did not cause* Mr. Floyd's death:

---

no entitlement to the luck of a lawless decisionmaker" when discussing whether a claimant could show prejudice *Id.* at 368 (quoting *Strickland*, 466 U.S. at 695 (cleaned up)). "An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. *Strickland*, 466 U.S. at 695. But the presumption of reliability that excludes this from the prejudice analysis "has no place where" a defendant pleaded guilty and thus was "deprived of a proceeding altogether." *Lee*, 582 U.S. at 368. And that's why when a court is instead "asking what an individual defendant would have done, the possibility of even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking. *Id.*

Q:     Now, you're not telling the jury, are you, sir, that Mr. Floyd died
       from a paraganglioma, are you?

A:     No.

(*State of Minnesota v. Chauvin*, 27-cr-20-12646, Trial Tr. April 14, 2021
at 178; *accord id.* at 45.) He had taken his shot at beating the case, but his
defense did not work.

Now Mr. Chauvin was in federal court. He had tried a defense that did
not work at his last trial. What was the point of going to trial again using the
same defense that had failed last time. Crucially, his attorney, Mr. Nelson, did
not tell him of Dr. Schaetzel's expert opinion that was completely different than
the opinion offered at his state court trial; remember that Dr. Schaetzel's
opinion is that Mr. Floyd's paraganglioma was *the cause* of Mr. Floyd's death,
and that Mr. Floyd was doomed to die before Mr. Chauvin was on top of Mr.
Floyd in the street. (DE 544-1 at 3-5.)[3] Had he known of this new defense, he
asserts that he would have gone to trial and not pled guilty.

And that makes sense given the circumstances. Mr. Chauvin has
diligently challenged his state conviction every step of the way. He appealed his
conviction to the Minnesota Court of Appeals. *State v. Chauvin*, 989 N.W.2d 1
(Minn. Ct. App. 2023). He petitioned the Minnesota Supreme Court to review

---

[3] Contrary to the government's assertions, (DE 553 at n.2), the failure of the
state defense expert to persuade the jury does not tell us whether Dr.
Schaetzel's opinion would persuade because the two opinions are different on
the crucial point of whether the paraganglioma was the cause of death, as
demonstrated above. The state expert said it wasn't the cause; Dr. Schaetzel
says it was.

his case, but that Court denied his petition on July 18, 2023. Then he petitioned the Supreme Court to hear his case, but that court denied him certiorari in November 2023. *Chauvin v. Minnesota*, United States Supreme Court Docket No. 23-416. Counsel knows from discussions with Mr. Chauvin that he plans to use the state's collateral review process (Minn. Stat. Chapter 590) to challenge his state-court conviction and, if he loses there, he plans to file a petition under 28 U.S.C. § 2254 to challenge his state conviction in federal court. He has been actively and diligently litigating his state conviction from the beginning, and he plans on continuing to do so.

Against that backdrop, pleading guilty in his federal case made sense only because his attorney had not properly consulted with him and he thought that he only had the same defense that he had already lost on. Had he known that he not only had a new defense, but also a defense that was entirely different on a crucial question—namely, whether the paraganglioma did in fact cause Mr. Floyd's death—he would have decided not to plead guilty and instead gone to trial.

Indeed, it's hard to understand Mr. Chauvin's litigating posture in the state court in any other way. When he pled guilty to the federal offense, he was, among other things, admitting that he caused Mr. Floyd's death. The statute Mr. Chauvin was indicted on federally, 18 U.S.C. § 242, requires that the government prove that "death results from" the defendant's acts in order to elevate the penalty. (DE 1.) The three State counts of conviction that Mr. Chauvin has been challenging so diligently—unintentional second-degree

21

murder (Count 1), murder in the third degree (Count 2), and manslaughter in the second degree (Count 3)—all require proof that Mr. Chauvin caused Mr. Floyd's death. So by pleading guilty in federal court, Mr. Chauvin was admitting an essential element of all three state-court convictions that he has been so diligently challenging, and that he continues to plan on challenging. Had he been informed by Mr. Nelson that he had a new defense to assert in federal court, he would have seized this opportunity and gone to trial. He could beat the federal case on this new defense, and his contesting the federal charge ensures that he can continue to challenge his state-court conviction without having admitted essential elements of those offenses in federal court (really, the *central* element: since there is no dispute that Mr. Floyd died and there is no dispute about what Mr. Chauvin's actions were on that day, his cases boil down to the core issue of whether his extensively videotaped conduct did in fact cause the death of Mr. Floyd).

Against this backdrop, even if were "highly improbable" that his new defense will succeed, that "possibility . . . may be pertinent to the extent it would have affected his decisionmaking." *Lee*, 582 U.S. at 368. Moreover, it's not highly improbable in any event. Dr. Schaetzel's opinion fits with the facts. It explains why after being startled by law enforcement in his car, Mr. Floyd became confused, delirious, panicky, had a sense of doom, experienced muscle weakness, and stated he couldn't' breathe while he was standing next to the squad car before he was prone in the street with Mr. Chauvin on top of him.

Mr. Nelson failed to inform Mr. Chauvin that he had a new defense in the form of Dr. Schaetzel's opinion. We know from the record that Mr. Nelson knew about this before Mr. Chauvin was even indicted federally. His failure to tell Mr. Chauvin constituted deficient performance, and it prejudiced Mr. Chauvin because his decision to plead was not informed. Mr. Nelson became the master of the representation. Mr. Chauvin was merely its object. That upends the whole Sixth Amendment framework, a framework that the effective assistance of counsel was designed to protect. Under these circumstances, Mr. Nelson did not provide effective assistance of counsel.

Though Mr. Chauvin believes that the Court can rule in his favor on this ground without an evidentiary hearing, Mr. Chauvin expressly requests an evidentiary hearing. An evidentiary hearing could provide more detail about what Mr. Nelson told Mr. Chauvin and when, Mr. Chauvin's thinking at the time he decided to plead guilty in federal court, the impact Mr. Nelson's failure to adequately consult with him had on his decision, and so on.

### 3.    Mr. Nelson's failure to test for metanephrine and catecholamine levels constituted ineffective assistance of counsel

While Mr. Chauvin urges the Court to grant his habeas motion based on Mr. Nelson's failure to inform him of Dr. Schaetzel's opinion as argued above, there is a separate ground to conclude that Mr. Nelson provided ineffective assistance of counsel. Namely, that Mr. Nelson should have had the preserved samples taken from George Floyd's body tested for metanephrine and catecholamine levels, and the tissue sections of the heart reviewed. (*See* DE

544-1 at 1-3, 5, 11.) The toxicology report did not test for catecholamine levels and their metabolites. (DE 544-1 at 13, 25-33.) Test results showing high levels of catecholamine levels and their metabolites would be compelling evidence that Mr. Floyd died as Dr. Schaetzel opined he did.

In the interest of judicial economy, Mr. Chauvin urges the Court to decide the failure-to-consult claim first. If the Court rejects that claim, he asks the Court allow counsel to test the preserved samples and have a medical professional examine the tissue sections of the heart. Discovery is expressly allowed under Rule 6 of the Rules Governing Section 2255 Proceedings, provided the Court concludes that there is good cause for the discovery. Given that these tests were not done, and given that the test results could confirm Dr. Schaetzel's opinion of how Mr. Floyd died, Mr. Chauvin submits that there is good cause to allow him to take this discovery, especially in light of the high stakes involved and his liberty interest.

Dated: July 31, 2024                   Respectfully submitted,

                                       *s/ Robert Meyers*
                                       _____
                                       ROBERT MEYERS
                                       Attorney ID No.  0388110
                                       Attorney for Mr. Chauvin
                                       107 U.S. Courthouse
                                       300 South Fourth Street
                                       Minneapolis, MN 55415